**Allerton CUSHMAN and Renee Cushman, Husband and Wife, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

Civ. A. No. 2085.

United States District Court
D. Arizona.

June 5, 1956.

McLane and McLane, Phoenix, Ariz., for plaintiffs.

Jack D. H. Hays, U. S. Atty., Phoenix, Ariz., for defendant.

LING, Chief Judge.

The above entitled cause having been heard by the Court on March 16th and 17th, 1955, and after considering the oral evidence, exhibits and written briefs by the parties, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact.

1. This is an action, for a refund of federal income taxes in the amount of $8,424.10, filed by plaintiffs, who are husband and wife. The complaint herein was filed within the period prescribed by law, and it was preceded by a timely claim for refund.

2. Jurisdiction is conferred upon the Court by section 1346, Title 28 United States Code.

3. Plaintiffs are residents of Phoenix, Arizona, and citizens of the State of Arizona.

4. On April 30, 1951, plaintiffs duly filed a joint federal income tax return for the calendar year 1950 with the Collector of Internal Revenue at Phoenix, Arizona, reporting thereon net income in the amount of $14,858.28 and a total tax due of $2,732.10. The sum of $2,732.10 was paid with the filing of the return. The said return did not claim a deduction arising out of the transaction which is the basis of this action.

5. On June 8, 1953, the Commissioner of Internal Revenue issued a Revenue Agent's report to plaintiffs in which it was proposed that an additional income tax of $4,954.82 be assessed against them. This additional tax of $4,954.82 plus $737.18 of interest was assessed on October 29, 1953, and was paid by plaintiffs on November 10, 1953 to the District Director of Internal Revenue at Phoenix, Arizona.

6. While plaintiffs did not dispute the correctness of the adjustments that were made in the Revenue Agent's report of June 8, 1953, their subsequent claim for refund set forth facts arising from transactions entered into with Mr. and Mrs. Murry Brophy, which they

believed entitled them to a deduction for the year 1950 which deduction had not been allowed by the said Revenue Agent's report.

7. The plaintiff, Renee Cushman, hereafter sometimes referred to as Mrs. Cushman, first became acquainted with Gene Burke Brophy and the latter's husband, Murry Brophy, in the Summer of 1945. At the time of the first meeting, and at all times thereafter, Mrs. Cushman was not related to either of the Brophys by blood or marriage nor were any of her close friends or relatives related to the Brophys by blood or marriage.

8. Toward the end of 1945, the Brophys sought out Renee Cushman, and requested a loan of $50,000 which sum was to be used to operate one or more radio stations. Immediately thereafter, Mrs. Cushman, who had no experience in the radio field and who knew nothing about the business of operating a radio station, consulted with her financial advisor, and discovered that the radio station business appeared to be profitable and that the Brophys had had considerable experience in the radio field. She also determined that estimates submitted to her by the Brophys regarding the cost of operation of a radio station seemed reasonable.

9. Subsequently, Mrs. Cushman agreed to loan the Brophys a total of $50,000 which was to be used to operate their Radio Station KRUX in Glendale, Arizona, whose Federal Communications Commission license was held by Gene Burke Brophy. It was agreed that the Brophys would execute promissory notes, and pay an interest rate of three per cent per annum on the $50,000 to be loaned to them by Mrs. Cushman.

10. Mrs. Cushman's motive and purpose in agreeing to loan the Brophys $50,000 was to earn interest on that sum.

11. The said loan was not to be paid over in one lump sum, but as needed by the Brophys for the operation of Radio Station KRUX, and was paid as follows:

| | |
|---|---|
| $15,000 | April 22, 1946 |
| $ 2,000 | October 10, 1946 |
| $10,000 | October 28, 1946 |
| $13,000 | December 4, 1946 |
| $10,000 | January 30, 1947 |
| $50,000 | Total |

Five demand promissory notes evidencing the above indebtedness were executed in favor of Mrs. Cushman by the Brophys.

12. During 1947, Mrs. Cushman contacted the Brophys to determine the date when they expected to be able to make repayment of the $50,000 loan. At that time Mr. Brophy advised her that he and Mrs. Brophy were unable to make repayment at that time, and requested additional loans of $35,000 to $40,000 to be used in the operation of the Brophy's Radio Station KRUX. In reply to this new request for further loans, Mrs. Cushman stated that she would not lend the Brophys any additional money.

13. The Brophys then requested Mrs. Cushman to guarantee additional loans at a bank if such loans could be procured advising her at the same time that unless the radio station continued operating, the original $50,000 loan could not be repaid. Before reaching a decision whether she should or should not guarantee loans to the Brophys by a bank, Mrs. Cushman consulted with her financial advisor, Mr. Latzko, of the New York brokerage firm of Hayden and Stone, and reached the conclusion that the $50,000 loan would be in jeopardy unless the Brophys obtained additional sums to operate Radio Station KRUX. Thereupon, it was agreed that Mr. and Mrs. Brophy would borrow $35,000 to $40,000 from the Chemical Bank & Trust Company of New York which loans would be guaranteed by Mrs. Cushman. Mrs. Cushman's motive in agreeing to guarantee the proposed $35,000 to $40,000 loans to the Brophys

by the Chemical Bank & Trust Company was to protect her own loan to the Brophys of $50,000 and also to enable her to collect interest on the $50,000 Brophy loans.

14. Subsequently, the Chemical Bank & Trust Company of New York, at Mrs. Cushman's request, loaned the following sums to Mr. and Mrs. Brophy on the dates set out below:

| Amount | Date |
|---|---|
| $ 6,000 | March 21, 1947 |
| 3,000 | April 4, 1947 |
| 15,000 | April 11, 1947 |
| 1,000 | June 2, 1947 |
| 12,000 | June 11, 1947 |
| $37,000 Total | |

Each loan carried an annual interest rate of 3%, and Mr. & Mrs. Brophy executed promissory notes in favor of the Chemical Bank & Trust Company for each loan. Mrs. Cushman's signature did not appear on any of the said promissory notes executed by the Brophys in favor of the bank. Instead the loans were secured or guaranteed by Mrs. Cushman's execution of Letters of Hypothecation and Stock Powers.

15. The execution of the Letters of Hypothecation and the Stock Powers permitted the Chemical Bank & Trust Company, in the event of a default in the loan, to dispose of the securities pledged in the Letters of Hypothecation to satisfy the loan. The fair market value of the securities required to be pledged by Mrs. Cushman, for the $37,000 loan by the Chemical Bank & Trust Company to the Brophys, exceeded the amount of the loans to the Brophys by approximately one-third. Each Letter of Hypothecation executed by Mrs. Cushman permitted Murry and Gene Burke Brophy to hypothecate and pledge Mrs. Cushman's securities listed therein as security for their indebtedness to the Chemical Bank & Trust Company.

16. Of the $37,000 borrowed by the Brophys from the Chemical Bank & Trust Company, the following amounts were received by the Brophys directly from the Chemical Bank & Trust Company either in the form of a check or by telegram:

| Amount | Telegraphed to Brophys | Check to Brophys |
|---|---|---|
| $ 3,000 | April 1, 1947 | |
| 15,000 | | April 11, 1947 |
| 8,000 | | June 11, 1947 |
| $26,000 Total | | |

The balance of the $37,000 or $11,000 was received by the Brophys by check directly from Mrs. Cushman as set forth below, and the loan proceeds of $11,000 were later credited to one of Mrs. Cushman's accounts at the Chemical Bank & Trust Company:

| Amount | Check to Brophys |
|---|---|
| $ 6,000 | March 17, 1947 |
| 1,000 | May 16, 1947 |
| 4,000 | June 2, 1947 |
| $11,000 Total | |

The three sums totaling $11,000 were temporarily paid by Renee Cushman to the Brophys before the loans to the Brophys were cleared by the Chemical Bank & Trust Company because of the latter's immediate need for the money.

17. After Mr. and Mrs. Brophy obtained the last of the Chemical Bank & Trust Company loan of $37,000, Mrs. Cushman repeatedly requested them to pay her the $50,000 they had borrowed from her. Instead of repaying the $50,000 owed to her, the Brophys requested additional loans for the operation of

Radio Station KRUX. Thereupon, Mrs. Cushman retained the Washington, D. C. law firm of Hansen, Lovette and Dale, a firm which specialized in F. C. C. law.

18. The firm of Hansen, Lovette and Dale advised Mrs. Cushman that a law suit against the Brophys for the collection of the $50,000 would be extremely undesirable for the reason that the license of Radio Station KRUX might be revoked. Mrs. Cushman was concerned about protecting the good standing and license of Radio Station KRUX since she believed it was the only asset owned by the Brophys. Therefore, discussing the matter with Hansen, Lovette and Dale, she decided to take over the radio station when and if possible, and to loan additional amounts to the Brophys to keep the Radio Station KRUX going until then.

19. Thereafter, Mrs. Cushman further loaned Mr. & Mrs. Brophy the following sums:

| $ 5,000 | August 29, 1947 |
| 5,000 | September 1, 1947 |
| 5,000 | October 14, 1947 |
| 500 | December 16, 1947 |
| $15,500 | |

20. In late December of 1947 or early January of 1948, Murry Brophy again contacted Mrs. Cushman seeking her guaranty or security on a loan to be obtained by the Brophys from the Valley National Bank for use in operating Radio Station KRUX. Although she was reluctant to do so, Mrs. Cushman agreed to guaranty a loan to be obtained by the Brophys from the Valley National Bank in the amount of $14,000 to protect her own loans to the Brophys and collect interest on those loans.

21. On January 10, 1948, Murry Brophy borrowed and received $14,000 from the Valley National Bank which debt was evidenced by a promissory note signed by Murry Brophy. Mrs. Cushman signed the said note on its face to secure or guarantee the Valley National Bank loan of $14,000 to Murry Brophy who received the proceeds thereof. Subsequent to January 10, 1948, Murry Brophy executed the renewal notes on the said $14,000 loan through the one dated September 7, 1948, while the renewal notes of December 6, 1948, March 7, 1949, and June 6, 1949, were executed by Murry and Gene Burke Brophy, and all of the renewal notes were executed on the face thereof by Mrs. Cushman.

22. In the Spring of 1949, plaintiff, Mrs. Cushman was again urged by Murry Brophy to loan the Brophys additional money to meet a payroll, and the sum of $3,224.51 was loaned to the Brophys by Renee Cushman. The $3,224.51 loan was evidenced by a promissory note executed by either or both of the Brophys.

23. In the Fall of 1949 and early in 1950, Mrs. Cushman discussed with the Brophys the manner in which the $68,724.51 indebtness to her and the $51,000 indebtedness to the two banks could be compromised. Mrs. Cushman demanded that 100% ownership of Radio Station KRUX be surrendered to her. However, Mr. & Mrs. Brophy refused to turn over 100% ownership, but suggested that they would transfer a 75% interest if the $68,724.51 indebtedness due Mrs. Cushman was cancelled and the $51,000 owed by them to the two banks paid by Mrs. Cushman. Because of her fear that the F. C. C. license for Radio Station KRUX, owned by Mrs. Brophy, would be in jeopardy if she sued the Brophys, Mrs. Cushman decided early in 1950 to take the 75% as the best solution to a bad situation. She was influenced greatly by the fact that her attorney had advised her, as a result of investigations made by him, that a suit against the Brophys would not result in the recovery of any money because their only asset was Radio Station KRUX.

24. Prior to the date of the above decision, Mrs. Cushman did not wish to conclude a compromise with Mr. & Mrs. Brophy because Radio Station KRUX

had made application for a better frequency which if it had been granted would have offered good prospects that the station would become profitable thereby allowing the Brophys to repay their loans.

25. For some time prior to the date in 1950 when Mrs. Cushman decided to obtain the 75% ownership, she had possession of a balance sheet of Radio Station KRUX as of October 31, 1949 prepared by a Phoenix certified public accountant. The balance sheet showed a net worth of $60,272.69 which included $21,161.19 of value assigned to organization expense, legal, engineering, surveys, etc. Plaintiff, Mrs. Cushman, discounted the $60,272.69 by the $21,161.19 and arrived at a real net worth of $39,111.50 of which she would in reality acquire 75% or $29,333.63.

26. The fair market value of Radio Station KRUX at the time Mrs. Cushman acquired a 75% interest did not exceed $30,000 to $35,000. Therefore, the fair market value of a 75% interest therein did not exceed the $29,333.63 representing 75% of the balance sheet real net worth.

27. Taking a 75% interest in a radio station having a fair market value of not more than $29,333.63 in compromise of a $68,724.51 loan due her and $51,000 due to two banks by the Brophys was the only means by which Mrs. Cushman could salvage anything from a bad economic situation.

28. After the agreement to transfer 75% of the Brophy holdings in Radio Station KRUX was made in January or February of 1950, Mr. and Mrs. Brophy borrowed, on March 15, 1950, an additional $14,000 from the Chemical Bank & Trust Company which sum of $14,000 was credited to the account of Mrs. Cushman. On March 25, 1950, Mrs. Cushman paid off the $14,000 indebtedness of Murry and Gene Brophy to the Valley Bank by a check in the sum of $14,388.89. The said payment of March 25, 1950, was made after a request for payment from Mrs. Cushman had been issued by the Valley Bank on March 1, 1950.

29. As a result of the above two transactions regarding the $14,000 loans to the Brophys by the two banks, Mrs. Cushman had simply effectuated a transfer of the $14,000 Valley Bank loan to the Brophys over to the Chemical Bank & Trust Company in New York thereby raising the Brophys' $37,000 indebtedness to the Chemical Bank & Trust Company to $51,000. However, Mrs. Cushman was not out of pocket any of the said $14,000 on March 25, 1950.

30. The mechanics by which the transfer of 75% ownership of KRUX was transferred to Mrs Cushman were as follows:

1. After obtaining F. C. C. approval on March 31, 1950, Mrs. Brophy transferred the license to Radio Station KRUX to Radio Arizona, Inc.

2. Later, on June 6, 1950, and after F. C. C. approval was obtained, Mrs. Brophy transferred enough stock to plaintiff, Renee Cushman, to give Mrs. Cushman 75% of the stock of Radio Arizona, Inc.

31. After the stock transfer occurred, plaintiff, Mrs. Cushman, surrendered the ten promissory notes totaling $68,724.51 to Mrs. Brophy, gave Mrs. Brophy a check for $31,500, and received from Mrs. Brophy at the same time a check for $31,500. The cross-exchange of $31,500 checks resulted in a net transaction whereby Mrs. Brophy received the $68,724.51 in notes without further payment of any kind except the transfer of 75% of her stock interest in Radio Arizona, Inc. The remaining portion of the transaction was consummated July 27, 1950 when the Brophy indebtedness of $51,000 to the Chemical Bank & Trust Company was paid by Mrs. Cushman.

32. In 1944, Mrs. Cushman loaned $25,000 to Watches of Switzerland at 4% interest. The loan and interest were paid in 1947.

33. In 1946, Mrs. Cushman loaned $4,000 to Your Knitting Studio at 3%

interest. The loan was repaid in 1948 with the interest.

34. In 1949, Mrs. Cushman made a loan of $46,000 to E. L. Scott at 5%. A small amount of principal remains unpaid at the date of trial. The balance of the principal has been repaid along with all interest payments.

35. In 1950, Mrs. Cushman loaned G. W. Page the sum of $59,000 at 5% interest. The loan was paid in full with all interest in 1953.

36. In 1950, persons named Gray & Pankey were loaned $57,000 at 6% interest by Mrs. Cushman, The $57,000 was repaid in 1954, along with all of the interest.

37. In 1951 $28,628.00 was loaned to the Phoenix Municipal Stadium by Mrs. Cushman at an interest rate of 5%. A portion of the principal and all of the interest has been paid to date.

38. From 1944 through 1951, Mrs. Cushman made twenty-one separate loans totaling $288,352.51 to various individuals. This total does not include the $51,000 obtained through the two banks by Mr. & Mrs. Brophy.

39. During the year involved herein, 1950, Mrs. Cushman loaned a total of $116,000 none of which represented the Brophy indebtedness.

40. During the period from 1946 through 1950 Mrs. Cushman was engaged in various businesses, including (1) ranching and cattle business, (2) rental of real estate, (3) production and sale of oil field chemicals, (4) conducting professional baseball, (5) buying and selling of stocks and bonds and (6) lending money. She employed a full time secretary who expended two-thirds of each working day on the above businesses, and maintained offices at her home and ranch. Her activities in the business of lending money during 1950 were frequent and continuous, that is, extensive, varied and regular.

41. During the year 1950, Mrs. Cushman was engaged in the trade or business of lending money.

42. During the year 1950, Mrs. Cushman settled or compromised the indebtedness of the Brophys to her of $119,724.51 ($68,724.51 plus $51,000) for $29,333.33. The difference or $90,390.88 represents a debt which became worthless in 1950.

43. The debt of $90,390.88 which became worthless had a proximate relation to Mrs. Cushman's trade or business of lending money engaged in by her during 1950.

44. The debt of $90,390.88 which became worthless in 1950 was a business bad debt.

### Conclusions of Law.

1. Section 23(k) of the 1939 Internal Revenue Code, 26 U.S.C. § 23(k) permits a taxpayer to deduct from gross income debts which become worthless within the taxable year. However, the section establishes two kinds of bad debt deductions for an individual. The first is called a business bad debt while the second is designated a non-business bad debt. The business bad debt can be deducted in full during the taxable year it becomes worthless, but a non-business bad debt is a more limited type of deduction.

2. The language of Section 23(k) clearly sets forth the different results of the two types of bad debts, but does not specifically define them. Instead a non-business bad debt is defined as "a debt other than * * * a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." It follows that a business bad debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

3. U. S. Treasury Regulations 118, sec. 39.23(k)–6 provide that in order for a debt to qualify as a business bad debt, it must be one which was owing the taxpayer in the course of a trade or business at the time it became worthless. That is, it must bear a proximate

relation to the taxpayer's trade or business at the time it became worthless.

4. A trade or business is that which involves the time and attention of men for purposes of a livelihood or profit. It involves frequency and continuity of action, that is, extensive, varied, and regular activities. Von Baumbach v. Sargent Land Company, 1917, 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460; Daily Journal Co. v. Commissioner, 9 Cir., 1943, 135 F.2d 687; Commissioner of Internal Revenue v. Boeing, 9 Cir., 1939, 106 F.2d 305; Schwinn v. Commissioner, 1928, 9 B.T.A. 1304, (acq.). Furthermore, a taxpayer can be engaged in several trades or businesses at one time. Irwin v. Commissioner, 1938, 37 B.T.A. 51 (acq.).

5. Plaintiff, Renee Cushman was engaged in the trade or business of lending money in 1950.

6. Having found as fact, and hereby concluding as a matter of law that plaintiff, Renee Cushman, was engaged in the trade or business of lending money in 1950, it follows that any debt becoming worthless that year which had a proximate relation to her trade or business of lending money is a business bad debt within the meaning of Section 23(k) of the 1939 Internal Revenue Code.

7. When a debtor disposes of a debt in the course of the debtor-creditor relationship, that is, by settlement or compromise with the debtor, the difference between the amount of the debt and the amount for which it is settled or compromised is a deductible debt. Hale v. Helvering, 1936, 66 App.D.C. 242, 85 F.2d 819; Stewart v. Commissioner, 1937, 39 B.T.A. 87; Carlson v. Commissioner, 1939, 39 B.T.A. 185; A.R.R. 30, 2 CB 138. Plaintiff, Renee Cushman settled or compromised the Brophy indebtedness to her of $119,724.51 for $29,333.63.

8. In computing the amount of the bad debt to be $90,390.88, the Court has added the $51,000 bank loans to the Brophys guaranteed by Mrs. Cushman to the $68,724.51 direct loans to Mr. and Mrs. Brophy by Mrs. Cushman thereby making a total of $119,724.51. From this total the fair market value of 75% of the stock of Radio Arizona, Inc. received upon compromise or $29,333.63 is subtracted leaving the total bad debt of $90,390.88. The Court has included the $51,000 as also being within the creditor-debtor category, not on the basis of a finding of fact that this $51,000 was in reality a loan by Mrs. Cushman to Mr. and Mrs. Brophy, but solely because it is persuaded by defendant's argument, based on the rationale of Putnam v. Commissioner, 8 Cir., 1955, 224 F.2d 947, that payment of a guaranty creates the necessary creditor-debtor relationship between the guarantor (Mrs. Cushman) and the primary borrowers (Mr. and Mrs. Brophy).

9. The debt of $90,390.88 became worthless during 1950.

10. The debt of $90,390.88 which became worthless in 1950 had a proximate relation to plaintiff, Renee Cushman's trade or business of lending money in which trade or business she was engaged in 1950.

11. The debt of $90,390.88 which became worthless during 1950 is a business bad debt sustained by plaintiff, Renee Cushman, during 1950 within the meaning of Section 23(k) of the 1939 Internal Revenue Code.

12. Plaintiffs are entitled to a refund of $8,424.10 plus interest at the rate of 6 per cent per annum on the sum of $2,732.10 from April 30, 1951, and the same rate of interest on $5,692.00 from November 10, 1953, and costs.

Judgment will be entered in accordance with the above Finding.