Lloyd E. Mangrum and Eleta P. Mangrum v. Commissioner.
Mangrum v. Commissioner
Docket Nos. 69134, 75235.
United States Tax Court
T.C. Memo 1960-136; 1960 Tax Ct. Memo LEXIS 155; 19 T.C.M. (CCH) 700; T.C.M. (RIA) 60136; June 27, 1960
*155 1. Petitioners, over a two-year period, advanced in excess of $50,000 to a corporation in which they owned 50 percent of the stock and controlled the other stock. The alleged "loans" were not represented by notes, and no provision was made for the payment of interest. Petitioners took over the management and operation of the corporation and changed the name to reflect their interest. Held, the advances were contributions to the capital of the corporation. 2. Where petitioners made only one loan in 1947 to their daughter, one loan in 1948 to a brother, seven loans in relatively small amounts for a short term in 1953, no loans in 1954, and one loan to their daughter in 1955, held, petitioners have failed to sustain the burden of proving that they were engaged in the trade or business of lending money in 1954, the year in which three promissory notes received from the brother became worthless. 3. Held, the bad debt arising from the worthlessness of the notes is a nonbusiness bad debt within the meaning of sec. 166(d) of the I.R.C. of 1954. *156 Wilson B. Copes, Esq., for the petitioners. Marion Malone, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined income tax deficiencies for the taxable years 1952 and 1954 in the respective amounts of $15,501.30 and $3,481.44. The question for the year 1952 is whether *157 a loss of $33,317.51 is a bad debt incurred in trade or business within the meaning of section 23(k) of the Internal Revenue Code of 1939, or, in the alternative, whether the amount represented an equity contribution to the capital of the corporation. The question for the year 1954 is whether $16,507.91 represented a bad debt incurred in trade or business within the meaning of section 166(a)(1) of the Internal Revenue Code of 1954, or whether such amount represented a nonbusiness bad debt within the meaning of section 166(d)(1). Two minor issues involving sales taxes and hotel expenses were stated, but no proof in respect thereof was shown. Findings of Fact Some of the facts are stipulated and are incorporated herein by reference. Petitioners are husband and wife residing in Apple Valley, California. They filed joint income tax returns with the director of internal revenue at Los Angeles, California. Petitioner Lloyd E. Mangrum, hereinafter referred to as Mangrum, for the taxable years in question was engaged in the trade or business of being a professional golfer. In 1942 the petitioners entered into a partnership agreement in which it was agreed *158 that Mangrum was to concern himself solely with professional golf activities, and Eleta Mangrum, hereinafter referred to as Eleta, was to handle all of the managerial duties involved in the professional golf activities of her husband. It was also agreed that Eleta was to manage the business activities of the partnership, hereinafter sometimes referred to as Mangrum and Mangrum. Petitioners devoted most of their time to professional golf and were on tour most of each year. On or about June 4, 1948, petitioners loaned to Orval and Jean Hurst, hereinafter referred to as Hurst, the sum of $3,500. Orval Hurst was Eleta's brother and Jean her sister-in-law. A promissory note was signed by both Hursts, with Eleta named as payee, and petitioners received, as collateral security for the repayment of the loan, a pledge of 490 shares of the capital stock of La Habra Radio and Appliance Co., hereinafter referred to as the corporation. On an unspecified date Hurst gave a mortgage on his home as additional security. The loan enabled Hurst to purchase a one-half interest, or a total of 490 shares of capital stock, in the corporation. Hurst made interest payments until approximately the spring *159 of 1950, when they ceased. Another individual, Hamm, owned the other 50 per cent interest in the corporation until shortly before August 1950. The corporation became financially distressed in 1949 or 1950. At that time Hurst approached the petitioners for money to enable him to continue the business. Petitioners, on the advice of their financial adviser and general business agent, Gideon J. Pillow, decided to make advances to the corporation. Before any money was advanced, the other one-half owner, Hamm, signed over his interest in the business to Eleta. Pillow took charge of the corporation's management and controlled the operations of the business. Hurst performed only a salesman's function. On or about November 1, 1950, the corporation changed its name to Lloyd Mangrum, Inc. At that time Mangrum and Pillow were the duly elected president and secretary. Eleta held 490 shares of the stock individually, and an additional 490 shares as trustee. The name was changed to improve the credit rating of the company. From August 1950 to January 1952 petitioners advanced $51,203.66 to the corporation in various amounts, of which $33,317.51 is here claimed as a bad debt. The corporation *160 failed financially, and in April 1952 the salable assets were sold at auction and the proceeds of such sale and all the remaining corporate assets were distributed to petitioners in December of that year. The corporation was dissolved on or about June 24, 1953. On or about December 1, 1952, Hurst entered into an agreement with petitioners to purchase the distributed assets, giving two notes. Note No. 1 was for $6,374.44, representing the purchase price of the assets, and note No. 2 for $1,640.48, representing the amount of liability assumed by the corporation. The note for $6,374.44 is not in issue. Hurst conducted the business thereafter at a profit but used the money realized in payment of personal living expenses and doctors' fees. No payments were made to petitioners. On October 29, 1954, petitioners individually and doing business as Mangrum and Mangrum brought suit against Hurst in a state court seeking judgment on three promissory notes, each dated December 1, 1952. The notes were in the amounts of $1,640.48, $5,390.92, and $7,968.60. The complaint set forth three causes of action, one for each note. Each cause of action contained an allegation that Hurst [defendant] *161 had, for valuable consideration, executed and delivered the promissory note to petitioners. A judgment in favor of petitioners was entered after default on December 2, 1954, for the full amount of the notes plus interest, attorneys' fees, and costs. The total of this judgment, $16,507.91, was claimed as a bad debt deduction in 1954. The note for $1,640.48 was one of the two notes given in consideration for the assets purchased by Hurst. Execution on the judgment was returned wholly unsatisfied on December 14, 1954. An examination inquiring into Hurst's ability to pay the judgment was conducted in December 1954. Hurst did not have sufficient assets to satisfy the judgment in whole or in part. The following loans were made for petitioners on the dates and in the amounts shown: Date
Payor
Payee
Relationship
Amount
8/21/47
Reina Franklin
Mangrum and
(Reina)
$2,618.00
Eleta,
William White
as joint tenants
Daughter
6/ 4/48
Orval Hurst
Eleta
Brother and
3,500.00
Jean Hurst
sister-in-law
7/16/53
Thomas Wells, for
Mangrum
500.00
Sotomayor
Furniture Mfg. Co., Inc.
7/23/53
Thomas Wells, for
Mangrum & Mangrum
500.00
Sotomayor
Furniture Mfg. Co., Inc.
8/26/53
Thomas Wells, for
Mangrum & Mangrum
1,000.00
Sotomayor
Furniture Mfg. Co., Inc.
10/ 1/53
Thomas Wells, for
Mangrum & Mangrum
1,000.00
Sotomayor
Furniture Mfg. Co., Inc.
11/ 9/53
Thomas Wells, for
Mangrum & Mangrum
3,000.00
Sotomayor
Furniture Mfg. Co., Inc.
11/18/53
Thomas Wells, for Home and
Mangrum & Mangrum
2,000.00
Auto Supply, Inc.
11/24/53
Thomas Wells
Mangrum & Mangrum
1,000.00
Gerda Wells
7/ 7/55
Reina Franklin
Mangrum and
Daughter
7,200.61
Eleta,
as joint tenants
Norman Thelin
Mangrum, or
Family friend
2,500.00
Eleta, or
Mangrum & Mangrum
*162 Petitioners placed an advertisement in the April 16, 1953 edition of the Los Angeles Times in the "Real Estate Loans" section of the classified ads, offering to lend money on residential property. Petitioners placed other advertisements in various newspapers from April 16, 1953, to October 1, 1953, stating that they had money to lend. Although there were some responses to the advertisements, petitioners' agent advised against making the loans, and no loans were made to those who had responded. A license to be a loan broker, if one was ever taken out, was not obtained before June 1954. Petitioners' financial adviser and general business agent, G. J. Pillow, was in control of making loans and selected the non-family recipients of such loans. The money advanced from August 1950 to January 1952 was a contribution to the capital of the corporation. The capital investment, in accordance with the concession of the respondent, became worthless in 1952. The notes sued upon in 1954, including the note for $1,640.48 accepted by petitioners for corporate assets, became worthless in that year when the judgment was wholly unsatisfied. Petitioners were not in the business of making *163 loans in 1954. Opinion VAN FOSSAN, Judge: After concluding whether the advances to the corporation are contributions to capital or loans, the basic issue in both years 1952 and 1954 is whether the unpaid balance of the advances to the corporation and the loss arising from the unsatisfied judgment are bad debts incurred in a trade or business. Petitioners having produced no evidence at the hearing nor made any argument on brief concerning the issues of the sales tax and hotel expenses, we hold that respondent correctly disallowed the amounts in dispute. In 1948 petitioners advanced $3,500 to Eleta's brother, Hurst, to buy a one-half interest in La Habra Radio and Appliance Co. The corporation floundered and, upon the suggestion of their adviser, petitioners advanced funds aggregating more than $50,000 to the corporation in various amounts over a two-year period beginning in 1950. Respondent takes a twofold approach to the loans to the corporation. First, he argues that the loans were contributions to capital and an equity investment of petitioners. Second, in the event the advances are held to be loans, then they were nonbusiness loans. Petitioners argue that they did not *164 possess, and had no intention of possessing, an equity interest in the corporation beyond that necessary to secure their creditor status. Secondly, they contend that they were in the "trade or business" of lending money and that, therefore, the debts in question were proximately related to their business and should be allowed as business debt deductions. Prior to making the loans, petitioners acquired all of the stock of the other shareholder. Apparently the other owner had defaulted on the business, leaving it in financial difficulties. Petitioners, through their agent, took over the management of the business. The name of the corporation was changed to reflect petitioners' interests. Various sums were advanced over a two-year period to a total of $51,203.66. The unpaid balance of $33,317.51 is here claimed as a bad debt deduction. No notes or other evidences of indebtedness were given in return for the advances. Respondent points to these factors as indicating that petitioners became the owners of the business, i.e., that the "loans" were really contributions to capital. Petitioners, on the other hand, argue that the advances were carried on the books as loans, that they intended *165 loans, that no security was necessary since they controlled the corporation, and that the advances were spread over a period of two years. This question in various forms has been considered many times by this and other courts. Nothing can be gained by again discussing the decisions. They are all controlled by the given facts. The factors emphasized by petitioners are pertinent, but such factors must be weighed along with all the relevant circumstances present in the whole record. It is clear to us that the purpose of the advances, however ill-advised, was to protect petitioners' investment in the corporation as represented by their ownership of 490 shares of the stock and the right to Hurst's 490 shares. The treatment given the advances on the corporate books is not conclusive. Petitioners received no notes from the corporation or any other evidence of indebtedness. Although it appears that petitioners expected interest, no formal provision was made for interest payments. Petitioners did not claim any unpaid interest due as part of the bad debt deduction. No date was fixed for the repayment of the advances and hence the obligations were not "repayable in any event" as loans or *166 other indebtedness contemplate. Although the record is silent as to the capital structure of the corporation, the necessity for in excess of $50,000 over a two-year period would seem to indicate that the corporation was grossly undercapitalized. Petitioners received no security other than the business itself, and we do not think that 100 per cent control of the corporation alters this fact. Repayment was actually contingent upon the success of the business. It also appears that the business was operating at a loss during the period in which the advances were made. Petitioners obtained an assignment of 490 shares of the stock. They were thus shareholders in the corporation - one-half owners - with control over the other stock. Petitioners operated the business, albeit through an agent, as their own, severing Hurst from the management even though he held 50 per cent of the stock. Petitioners changed the name of the corporation to improve its credit, and such action would seem to be an indication that petitioners fully intended to operate the business for their profit and as their venture. Weighing all these facts, we are satisfied that petitioners placed the advances at the risk *167 of the business with the full intention of sharing in the profits as owners beyond their creditor status had the venture succeeded. Joseph B. Thomas, 2 T.C. 193; Prutzman v. Commissioner, 218 F. 2d 603 (C.A. 2), affirming a Memorandum Opinion of this Court. Although the matter may not be completely free of doubt, it is our best judgment on the entire record that the advances were contributions to capital and not loans. They did not create debts. Accordingly, the deduction for worthlessness of petitioners' investment must be governed by the provisions relating to capital assets rather than by the bad debt provisions, which fact will be given effect in a Rule 50 computation. The Internal Revenue Code allows deductions for business bad debts. Sec. 166(a)(1) of the 1954 Code. [1] However, the loss in case of a nonbusiness bad debt, i.e., a loss not incurred in the taxpayer's "trade or business," is subject to the limitations applicable to short-term capital losses. Sec. 166(d)(1) and (d)(2) of the 1954 Code. [2] The test of which subsection shall apply is whether the petitioners were engaged in a trade or business to which the debt in question was proximately *168 related. The question is essentially one of fact as to which the petitioners have the burden of proof. Rendlen v. United States, 178 F. Supp. 367 (E.D. Mo.); Robert Cluett, III, 8 T.C. 1178; W. A. Dallmeyer, 14 T.C. 1282; sec. 1.166-5, Income Tax Regs.
*169 Petitioners made a loan to their daughter Reina in 1947, and in 1948 the loan to Hurst of $3,500, above discussed. Seven loans were made in 1953 in a total amount of $9,000. No loans were made in the period 1950 through 1952. Only the capital contributions previously discussed were made. No loans were made in 1954. One loan for $7,200.61 was made in 1955 to petitioners' daughter Reina. A loan was made to Norman Thelin, a friend of the family, at an undisclosed date. Petitioners in 1953 ran certain newspaper ads indicating their willingness to lend money on real estate. There were responses, but petitioners, on the advice of their agent, declined to lend money to any who applied. If a license to be a loan broker was in fact ever procured, it was not obtained until June 1954. Upon these facts petitioners argue that they were in the business of lending money in the taxable year 1954. If we so find, it follows that the debts arising from the worthlessness of three promissory notes executed by Hurst were business bad debts and deductible as such. For a business bad debt deduction to be taken in such cases, the year of the loss must be a year in which the taxpayer's business was *170 lending money. Jan G. J. Boissevain, 17 T.C. 325; Dominick J. Salomone, 27 T.C. 663. The promissory notes, sued upon in 1954, including the note for $1,640.48 accepted by petitioners for corporate assets, became worthless in that year, and the judgment on the notes went wholly unsatisfied. Two isolated loans to members of the family in 1947 and 1948, though they were evidenced by notes and secured, and advances to the capital of a corporation in which petitioners held a large interest, are not enough to catalog petitioners as being in the money lending business from 1947 through 1952. S. D. Ferguson, 28 T.C. 432, affd. 253 F. 2d 403 (C.A. 4). In 1953 petitioners made six loans to Thomas Wells as agent for two businesses. The seventh loan was to Wells and his wife. The loans were made through petitioners' business agent, Pillow. Some newspaper advertising was undertaken, but no loans were made to any who responded. It is not established that a loan broker's license was ever obtained. No loans were made in 1954. Only one loan was made in 1955, and that to petitioners' daughter. This arrangement indicates a pattern of loans *171 only to their immediate family or those appearing to be family friends or associates of petitioners' business agent. Eleta testified that the initial loan of $3,500 to Hurst in 1948 is still in default. She received a mortgage on the Hurst home as security which apparently has not been foreclosed to satisfy the indebtedness. Such would indicate that petitioners did not regard advances to members of the family and associates strictly as loans. Only eleven loans were made over a period of eight years. These loans, except for the sum of $7,200.61 to petitioners' daughter, were all in relatively small amounts. Except as to members of the family and friends, the loans were of short duration. The arrangement was too limited to suggest a finding that petitioners were in a regular business of lending money, i.e., occasional loans do not constitute a "trade or business" within the meaning of section 166 of the 1954 Code. Max M. Barish, 31 T.C. 1280; Campbell v. Walker, 208 F. 2d 457 (C.A. 5). See Estate of William P. Palmer, Jr., 17 T.C. 702. Cf. Cushman v. United States, 148 F. Supp. 880 (D.C.Ariz.). Careful consideration of all the facts leads *172 us to the conclusion that petitioners have failed to sustain the burden of proving that they were engaged in the trade or business of making loans in 1954. It appears that Hurst successfully operated an appliance repair shop with the assets sold to him by petitioners in 1952. The record is silent as to the extent of his financial success. In any event, he utilized such funds as he possessed for personal expenses, including doctors' fees, and paid petitioners nothing on the notes. There was a possibility that the business would prosper, and there was a possibility that the notes would be paid prior to 1954. Petitioners secured a judgment against Hurst on three notes in 1954 for $16,507.91, including interest, attorneys' fees, and costs. The note for $1,640.48 was one of the two notes given by Hurst to petitioners for the corporate assets. Petitioners endeavored to collect on their judgment by legal process, but failed. An examination of Hurst's ability to pay was undertaken, but it failed to disclose any assets. Nothing appears in the record concerning the other notes for $5,390.92 and $7,968.60 except to the extent explained in the certified copy of the judgment and a certified *173 copy of the complaint. The complaint recites that the notes were given "for valuable consideration." Judgment was rendered for petitioners on the basis of this complaint. Petitioners claimed the total sum of $16,507.91 on their 1954 income tax return as a business bad debt. Respondent disallowed the deduction for the full amount. While we have found as a fact that petitioners were not in the money lending business in the year 1954, we think that petitioners have met the burden necessary to permit a nonbusiness bad debt deduction. The judgment establishes the existence of the bad debt and, prima facie at least, establishes the existence of the underlying notes. We have found that the notes became worthless in 1954, in which year the judgment was obtained and went wholly unsatisfied. We hold, therefore, that petitioners are entitled to a nonbusiness bad debt deduction to the extent provided in section 166(d) of the 1954 Code. See Eugene M. Alexander, 26 T.C. 856. The amount deducted, viz., $16,507.91, included interest. Petitioners have not shown that any of this interest was ever taken into income, and hence the respondent correctly disallowed a deduction of the interest. *174 The attorneys' fees and costs, claimed by petitioners under section 166 of the 1954 Code, are more properly deducted under section 212 of the 1954 Code. Decisions will be entered under Rule 50. Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
2. (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩