LEON J. GREENSPAN and IRENE GREENSPAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greenspan v. Commissioner
Docket No. 5255-76.
United States Tax Court
T.C. Memo 1980-33; 1980 Tax Ct. Memo LEXIS 549; 39 T.C.M. (CCH) 1000; T.C.M. (RIA) 80033; February 6, 1980, Filed Leon J. Greenspan, pro se. Richard M. Campbell and Karen Martino, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Addition to tax
Year
Deficiency
Sec. 6653(a) [1]
1972
$117,133.58
$5,856.68
1973
6,653.93
332.70
. Concessions having been made by both parties, the issues remaining for decision are whether petitioners are entitled to certain deductions for business bad debts, losses, or expenses in 1973. The parties agree that the medical deductions for the years at issue will be recomputed to take into consideration the concessions and our decision.
FINDINGS OF FACT Petitioners resided in White Plains, N.Y., at the time they filed their petition herein. They filed their joint income tax returns for 1972 and 1973 with the District Director, Internal Revenue Service, New York, N.Y. Leon Greenspan (hereinafter Greenspan) *551 is an attorney and a member of the law firm of Greenspan and Jaffe in White Plains. On May 17, 1968, Greenspan and one Howard Harper loaned $18,750 to Group V Ltd., a New York corporation, payable in 90 days with interest of 7.5 percent per annum payable monthly, connecing June 17, 1968. Raymond Filiberti (hereinafter Filiberti), who represented that he was sole owner of all the issued and outstanding shares of Group V Ltd., guaranteed the loan. Group V Ltd. and Filiberti assigned as security for the loan Filiberti's ten shares of Group V Ltd. stock (representing all of the outstanding shares); all of their right, title, and interest in certain coal deposits in Tennessee and in the literary property known as "Born in Wedlock"; and their right, title, and interest in and to a contract between Group V Ltd. and one Judy Garland for the exclusive use of the latter's services, including the gate receipts from six specified performances by Ms. Garland in September and October, 1968. Greenspan and Harper each had a one-half interest in the loan. They filed suit against Group V Ltd. and Filiberti in October 1968 in the Supreme Court, State of New York, Westchester County, alleging *552 that no part of the note had been paid. On June 26, 1970, they obtained a judgment in the amount of $21,720.12, consisting of $18,750 principal, $2,925 interest, and $45.12 costs. Greenspan and Harper tried unsuccessfully to collect on the judgment. They investigated Filiberti's assets from 1970 through 1972, while receiving promises to pay; by late 1972, Greenspan concluded that Filiberti's net assets were virtually nonexistent.[2] He determined that the judgment was worthless in 1973 when he learned of other substantial judgments obtained against Filiberti for fraud and embezzlement and that Filiberti was then in jail. Greenspan represented one Wesley Smith (hereinafter Smith) in connection with the purchase by Smith of a cosmetics company. This was the only transaction in which Greenspan had been involved with Smith as his client. On the date of the sale, the seller refused to transfer title to the business unless he received some cash. As Smith had none, Greenspan loaned him $2,500 and the sale was completed. Upon Smith's failure to repay the loan, *553 Greenspan commenced an action against Smith in the Supreme Court, State of New York, Westchester County. He received a verdict in his favor and obtained a judgment against Smith on December 27, 1974, in the amount of $3,448.55, consisting of $2,500 principal, $656.25 interest, and $292.30 costs and disbursements.
A subpoena duces tecum was served upon Smith in January 1975, commanding him to appear for the taking of testimony and the production of certain documents. In 1975, after a supplementary proceeding conducted by Greenspan and his law partner, Paul Jaffe, in which Smith was examined as to his assets, Greenspan determined that Smith had none. On June 12, 1973, Greenspan's broker, Kidder, Peabody and Co., sold LTV bonds in the face amount of $200,000 in Greenspan's account for $79,331.80. Of the bonds sold, $43,000 face amount belonged to Greenspan's father-in-law, Abe Gordon, and had been transferred into Greenspan's account in November 1971 as collateral to cover a margin call. At the same time, Kidder, Peabody and Co. also sold LTV bonds in the face amount of $50,000 belonging to Joseph Greenspan, Greenspan's father, for $19,062.50. On August 6, 1973, Greenspan purchased *554 LTV bonds in the face amount of $43,000 for $19,797.92. When Greenspan began his practice of law, both his father and father-in-law had referred clients to him. He had close family and personal relationships with both and felt that he had a moral, although not a legal, obligation to reimburse any loss they may have suffered when their LTV bonds were erroneously sold. On Decmeber 10, 1971, Frank Sacco, defendant in United States v. Sacco, United States District Court, Middle District of Florida, Orlando Division, requested Greenspan be appointed counsel as replacement for Gregory Presnell, who was appointed counsel on July 15, 1971. Sacco, a former client of Greenspan's who had fallen on hard times, asked him to come to Florida to represent him. Despite the fact that Sacco's request to the court was denied on December 10, 1971, Greenspan traveled to Florida to represent him. On January 27, 1972, Greenspan paid the Robert Meyer Hotel, Orlando, Florida, $1,085.12. On March 9, 1972, the Court of Appeals for the Fifth Circuit ordered that Presnell be relieved as court appointed attorney and that Greenspan be appointed to represent Sacco on his appeal. On April 11, 1972, the *555 District Court denied Greenspan's motion that he be appointed counsel nunc pro tunc in order to be paid by the Government for expenses incurred prior to March 9, 1972. The Court of Appeals for the Fifth Circuit denied his motion for appointment as counsel nunc pro tunc on May 18, 1972. OPINION Petitioners argue that Greenspan's loans to Group V Ltd. and to Smith were business debts, because they arose in connection with Greenspan's trade or business of being an attorney, and that they became worthless in 1973 and are, therefore, deductible under section 166(a). In the alternative, they argue the losses are either from a transaction entered into for profit, thereby entitling them to an ordinary loss deduction under section 165(d)(2), or that they are deductible as ordinary and necessary business expenses under section 162(a). Respondent argues that petitioners are not entitled to an ordinary deduction because Greenspan was not in the business of making loans and because the loans were not proximately related to his trade or business of being an attorney. He further contends that petitioners have not established that the debts became worthless in 1973. Initially, we note *556 that petitioners' attempts to bring the Group V Ltd. and Smith transactions under section 165 and 162 are totally without merit. Both transactions involved debts and it has long been established that, in such situations, the creditor is entitled to a deduction for worthlessness, if at all, only under the provisions of the Code relating to bad debts. Putnam v. Commissioner, 352 U.S. 82, 87-88 (1956) (under the 1939 Code); United States v. Generes,405 U.S. 93, 100, 101-102 (1972) (under the 1954 Code). As a further initial observation, we also note that it is well-settled that a taxpayer can be engaged in more than one trade or business at the same time. Achong v. Commissioner, 246 F.2d 445, 447 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; Cushman v. United States, 148 F. Supp. 880, 887 (D. Ariz. 1956); Sherman v. Commissioner, 16 T.C. 332, 337 (1951). The record herein, however, is clearly insufficient *557 to warrant the conclusion that Greenspan's activities as a lender were sufficiently extensive and continuous so as to elevate that activity to the status of a separate business. [3] Cf. Imel v. Commissioner, 61 T.C. 318, 323 (1973), and cases cited thereat. Indeed, petitioners do not seriously argue that Greenspan's lending activities had any significance separate and apart from his law practice. We thus turn to the question as to whether there was a sufficient nexus between the Group V Ltd. and Smith loans, on the hand, and Greenspan's law practice on the other, to constitute the indebtedness involved as business debts. The issue is one of fact. Smith v. Commissioner, 60 T.C. 316, 318 (1973); sec. 1.166-5(b), Income Tax Regs.
After weighing all the evidence -- which is meager to say the *558 least -- we conclude that the Group V Ltd. and Smith transactions gave rise to nonbusiness debts. With respect to the Group V Ltd. loan, there is no evidence whatsoever as to any connection with Greenspan's law practice. Greenspan merely testified that he entered into the transaction in order "to make a profit," i.e. through earning interest. Such being the case, the loan is a nonbusiness debt under section 166(d)(2)(A). With respect to the Smith loan, we recognize that the loan would not have been made but for the fact that Smith was a client of Greenspan's firm and the sale would not have been closed without it. But Smith's relationship to the firm was a one-shot situation and we are not persuaded that, in such a situation, the mere existence of a "but for" relationship, in a single transaction such as the Smith loan, is sufficient to enable petitioners to carry their burden of proof. Gustin v. Commissioner, T.C. Memo. 1968-42, affd. per curiam 412 F.2d 803 (6th Cir. 1969). [4] We think that the "dominant motivation" test of United States v. Generes, 405 U.S. at 103, *559 requires something more than the existence of a "but for" relationship. Cf. W. W. Windle Co. v. Commissioner, 65 T.C. 694 (1976), appeal dismissed for lack of jurisdiction 550 F.2d 43 (1977). Nor do we think that Greenspan's conclusory and uncorroborated statements (see footnote 3, supra) that he regularly made loans in order to enable real estate deals to be completed require a contrary conclusion. Moreover, even if we were to accept such testimony, it would not follow that such a practice on the part of Greenspan, whatever bearing it might have on other transactions, would necessarily govern the treatment of the Smith loan. The cases cited by petitioners are all distinguishable on their facts. [5]
Petitioners are entitled to deduct nonbusiness debts as short-term capital losses in *560 the year in which they became worthless. Section 166(a) and (d). The test of worthlessness is objective, not subjective. Redman v. Commissioner, 155 F.2d 319 (1st Cir. 1946); Cf. Boehm v. Commissioner, 326 U.S. 287 (1945). It is a question of fact to be determined from all the facts and circumstances, with the burden of proof on the petitioners. Mueller v. Commissioner, 60 T.C. 36, 41 (1973), affd. in part and revd. in part on other grounds 496 F.2d 899 (5th Cir. 1974). Petitioners must show that the debt had a value at the beginning of the taxable year in question -- in this case 1973 -- and that it became worthless during and prior to the end of that year. Millsap v. Commissioner, 46 T.C. 751, 762 (1966), affd. 387 F.2d 420 (8th Cir. 1968). We find that they have failed to carry their burden. Greenspan obtained judgment against Group V Ltd. and Filiberti on June 26, 1970. He decided to write off the loan after investigating Filiberti's assets in 1970, 1971, and 1972, learning of other judgments against him, and seeing him in prison in 1973, because he determined Filiberti *561 was judgment-proof. Petitioners presented little evidence that the loan had value prior to the taxable years at issue, or which demonstrated that Filiberti was judgment-proof, or of any identifiable events which made the debt worthless in 1973. Greenspan's unsupported testimony that the debt was worthless in 1973 is insufficient, as it is simply a reflection of a subjective judgment. Cf. Fox v. Commissioner, 50 T.C. 813 (1968), affd. per curiam in an unreported order (9th Cir. 1970, 25 AFTR 2d 70-891, 70-1 USTC par. 9373); Bryan v. Commissioner, 32 T.C. 104, 131 (1959), affd. on this issue 281 F.2d 238 (4th Cir. 1960). Furthermore, petitioners offered no evidence as to the financial condition of Group V Ltd., the primary obligor on the note. Finally, they presented no evidence as to what action was taken on the collateral for the note. A debt is not wholly worthless to the extent that the collateral securing it has value. See Hunt v. Commissioner, 33 B.T.A. 946, 950-951 (1936). [6] Thus, on the basis of the *562 record before us, we cannot find that the Group V Ltd. debt was worthless, much less the year in which worthlessness occurred. We reach the same conclusion as to the loan to Smith. Petitioners claim that the debt, which was incurred in 1971, became worthless in 1973. Yet, Greenspan instituted an action against Smith in 1974 for which he obtained a judgment in December 1974 and continued trying to satisfy that judgment in January 1975.[7] Petitioners have presented nothing but Greenspan's unsupported conclusion that the debt was worthless in 1973. This is insufficient to carry their burden of proof.
Petitioners' argument that we should disregard the later action against Smith as indicating that the claim may still have had "potential value," because it was only brought to defend Greenspan's reputation against a charge of fraud, must be similarly rejected. The documentary evidence indicates that the action was commenced by Greenspan on the note, and does not reveal any charges of fraud. In any case, we find nothing in the evidence indicating the note did not have some value at the end of 1973. *563 We turn now to the sale and repurchase of the LTV bonds. Petitioners argue they are entitled to deduct $10,000, stemming from Greenspan's reimbursement of his father's and father-in-law's investment losses. Greenspan claims this deduction either as a business expense under section 162(a), because it was necessary to protect his business reputation, or as a section 165 loss pursuant to an indemnification made in connection with his trade or business. We first note that petitioners have not established that Greenspan's father or father-in-law suffered losses on the sale of the LTV bonds. No evidence was introduced as to their bases for the bonds. [8] Thus, we cannot ascertain whether, or in what amount, losses were suffered on the sale of the bonds. Even were we to assume that losses were suffered by their fathers, petitioners have not established that the losses were in fact reimbursed to the extent *564 of the $10,000 claimed loss or any other amount. We have found that Greenspan purchased $43,000 face value in LTV bonds approximately two months after the bonds were initially sold, but we have no evidence as to what subsequently happened to these bonds. Thus, the claimed amount must be disallowed because they have failed to carry their burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142 (a), Tax Court Rules of Practice and Procedure.
Even if reimbursement of the losses had been proved, we would hold that petitioners were not entitled to any deduction. Greenspan concedes that he had no legal obligation to reimburse either his father or his father-in-law. Instead, he claims he did so out of a "moral obligation." He argues that he had to reimburse them to protect his reputation. He testified that both men had referred clients to him when he had begun his law practice and he thought that people would be reluctant to use a lawyer who had not taken care of his father or father-in-law. We cannot believe that Greenspan's primary motive in reimbursing his father-in-law (or father) was to protect his law business. He testified that his firm's specialty *565 was complex corporate litigation and failed to explain how this practice would be affected by losing referrals from a small grocery store owner (Greenspan's father-in-law) or a union official (his father). More importantly, petitioners did not convince us that, to the extent that Greenspan did receive referrals from his father and father-in-law, these were in danger if the bonds were not replaced. Petitioners failed to produce evidence on this subject. Petitioners rely on certain of our cases in which taxpayers were permitted to deduct expenses incurred in reimbursing individuals due only to a moral obligation in order to protect their business. Milbank v. Commissioner,51 T.C. 805 (1969); Pepper v. Commissioner,36 T.C. 886 (1961). Both cases are distinguishable in principle, as well as in fact. In Milbank, the taxpayer was an investment banker. A bank made a loan to a Cuban corporation whose financing he had arranged. The loan was guaranteed by a corporation of which the taxpayer owned a half interest, based on the understanding that he stood behind it. The Cuban government expropriated the Cuban Factory. When the Cuban and the taxpayer's *566 corporations could not repay the loan, the bank looked to the taxpayer, who personally paid it out of a moral obligation. We permitted a 162(a) deduction for that taxpayer because the expenses "grew out of an arrangement between [the taxpayer] and the bank and [the arrangement] was entered into to protect [his] business as an investment banker." See 51 T.C. at 818-819. In Pepper v. Commissioner,supra, we permitted two law partners to deduct their reimbursement of a client's creditors as an ordinary and necessary business expense. In that case, they arranged the financing for a client organizing a plastic housewares jobbing business, including many of their friends, clients, and acquaintances as investors. The client engaged in fraudulent activities, resulting in substantial losses for the investors when the business went bankrupt. We found, on that record, that the payments arose out of the taxpayers' trade or business, because they were necessary to "retain or protect" the taxpayer's business (36 T.C. at 895), and were "essential to the very continuance of the petitioners' practice, for the protection of their means *567 of livelihood" (36 T.C. at 896). In both Milbank and Pepper, the necessary nexus and dominant motivation were clearly present. Neither case involved payments in discharge of moral obligations to close relatives, such as is involved herein. [9] Given these distinctions and the paucity of the evidence herein, we think that petitioners have failed to carry their burden of proof that they are entitled to any deduction with respect to the claimed losses resulting from the sale of their fathers' LTV bonds. We turn now to the issue of the hotel expenses (which respondent concedes were paid by Greenspan). Petitioners argue that Greenspan paid these expenses in connection with his defense of Sacco on criminal charges in Florida. Respondent counters that petitioners are not entitled to deduct these expenses because they were neither ordinary nor necessary, they were not shown to be nonreimbursable by the law firm, and they were taken in the wrong year. Although, as respondent infers, Florida may be a nice place to visit in January, we believe that petitioners have demonstrated that Greenspan's *568 activities in Florida were connected to his defense of Sacco. A short time after his departure for Florida, the Court of Appeals for the Fifth Circuit reversed the District Court and appointed him Sacco's counsel. The fact that that court later denied him reimbursement for expenses incurred prior to his formal appointment does not require the conclusion that he was not working on the case. Respondent's argument that the expense should be denied because Greenspan failed to seek reimbursement from his law firm also fails. We agree that the law is settled that if the partner could have been reimbursed for such expenses, but failed to seek reimbursement, the deduction is denied. Cf. Wallendal v. Commissioner,31 T.C. 1249, 1252 (1959). Petitioner testified, however, that, while the Sacco defense involved a former client of the firm, he was defending him on his own. He believed it would have been inappropriate for him to seek reimbursement while he was not contributing to the partnership. We cannot find that this failure to seek reimbursement should deny him the deduction, *569 especially given the variety of ways in which law firms operate and Greenspan's familiarity with his own firm's practice. We think that the hotel expenses are properly deductible as an ordinary and necessary business expense. The only question in our minds is the proper year of deduction. Respondent argues that, if the expense is allowed, 1972 is the proper year because the expense was incurred and reimbursement was denied by both courts in that year. Petitioners argue that 1973 is the proper year because it was then that Greenspan finally gave up hope for reimbursement. Petitioners first claimed this expense for 1973 in their petition before this Court. We think it clear on the evidence before us that 1972 is the proper year because it is in that year that the Court of Appeals denied Greenspan's claim for reimbursement. Both taxable years 1972 and 1973 are before us. We have found that the hotel expenses are deductible as ordinary and necessary expenses under section 162. We think that Rule 41(b), Tax Court Rules of Practice and Procedure, [10] gives us sufficient leeway to conclude that petitioners are entitled to deduct the $1,085.12 in hotel expenses in taxable year 1972 *570 rather than 1973. The last issue remaining for resolution is the $600 deduction for transportation expenses incurred in Greenspan's legal practice. Other than vague testimony by Greenspan that he visited Sacco in various locations following his trial in 1972, this item is completely unsubstantiated. It is not even clear whether those trips to see Sacco were in 1973. We, therefore, hold that petitioners have failed to meet their burden of proof and that the $600 deduction is disallowed in its entirety. *571 [11]
One final word. Greenspan was the sole witness for petitioners. His testimony was in many respects general and vague and failed to fill in a number of obvious gaps. There were numerous factual elements which could readily have been supplied by other written evidence. More importantly, much of Greenspan's testimony was directed toward his subjective judgments. Several aspects of that testimony could easily have been corroborated. Under the foregoing circumstances and particularly in light of the fact that Greenspan is a lawyer who presumably understood the need to make a case sufficient to carry petitioners' burden of proof on the issues involved (see Rule 142(a), Tax Court Rules of Practice and Procedure), we are entitled not to accept Greenspan's self-serving statements as gospel. See United States v. Generes,405 U.S. at 106; Geiger v. Commissioner,440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; National Fireworks, Inc. v. Commissioner,243 F.2d 295, 297 (1st Cir. 1957), affg. a Memorandum Opinion *572 of this Court; Uncasville Mfg. Co. v. Commissioner,55 F.2d 893, 897 (2d Cir. 1932), revg. on other grounds 19 B.T.A. 920 (1930); Verra v. Commissioner,T.C. Memo. 1972-199, affd. per order 474 F.2d 1336 (2d Cir. 1973). Decision will be entered under Rule 155.
Footnotes
1. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue↩
2. There is no evidence in the record as to the financial status of Group V Ltd. during the comparable period of time.↩
3. Greenspan testified that he loaned funds to facilitate the closing of real estate deals for clients and that he invested funds for clients from a special account. But this evidence is too vague and general to justify the conclusion that Greenspan was in the trade or business of making loans or of investment counseling.↩
4. See also Estate of Libby v. Commissioner↩, T.C. Momo. 1955-180. 5. Brenhouse v. Commissioner, 37 T.C. 326 (1961); Bart v. Commissioner, 21 T.C. 880 (1954); Garlove v. Commissioner, T.C. Memo. 1965-201↩.
6. Cf. Jessup v. Commissioner, T.C. Memo. 1977-289↩.
7. The record shows that Greenspan examined Smith in supplementary proceedings in 1975 and Greenspan testified that this examination showed that Smith had no assets.↩
8. The petition contains allegations as to bases for their fathers' bonds which were denied by respondent's answer and such allegations were repeated in petitioners' brief. These statements do not constitute evidence. Rule 143(b), Tax Court Rules of Practice and Procedure.↩
9. See Rollins v. Commissioner,T.C. Memo. 1979-331↩.
10. Rule 41. Amended and Supplemental Pleadings. (b) Amendments to Conform to the Evidence.-- (1) Issues Tried by Consent. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues; but failure to amend does not affect the result of the trial of these issues.↩ [Emphasis added.]
11. It also appears that petitioners have abandoned this issue on brief.↩