ROBERT GAYLORD, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 96953.    Promulgated May 14, 1940.

*Ernest J. Brown, Esq.*, for the petitioner.
*Arthur W. Carnduff, Esq.*, for the respondent.

1122

OPINION.

MELLOTT: The amended petition alleges that the claimed deduction of $12,451.58 should be allowed as a loss not compensated for by insurance or otherwise under section 23 (f) (all references being to the Revenue Act of 1936); under section 23 (a) as an ordinary and necessary expense paid or incurred during the taxable year in carrying on a trade or business; under 23 (q) as a contribution; or under 23 (k) as a debt ascertained to be worthless and charged off.

The respondent denies that the deduction is allowable under any of the sections relied upon. He contends that petitioner merely made a voluntary contribution; that it participated in the "rescue party" purely as a "matter of civic pride"; that the amount was not paid as an ordinary or necessary expense of carrying on its trade or business; and that since petitioner signed an agreement extending the 1931 contract to December 31, 1939, no deduction can be taken until after that date.

Petitioner's argument in connection with its claim that the amount is deductible as a loss, a contribution, or a debt ascertained to be worthless, is not without substantial merit. We are of the opinion, however, that the issue may be determined by ascertaining whether or not the expenditure constituted "an ordinary and necessary" busi-

ness expense within the purview of section 23 (a),[1] shown in the margin.

That petitioner places substantial reliance upon this section is indicated by the testimony of its president. When asked why he signed the agreement, he stated: "We were trying to save the situation. It was a tough picture in town. There were rumors going around * * *. Rumors always circulate * * *. We had quite an equity in this picture here. We had accounts receivable that were centered around this area. We had our balances, bank balances, I do not know the exact figure, but I imagine we had around a quarter of a million dollars." When asked whether or not he felt that the involuntary closing of the Franklin-American would adversely affect his business he replied: "Most decidedly. It would probably paralyze the Christmas trade right in the center of it. That would mean that our orders would eventually be cut off."

It has been stipulated, and we have found as a fact, that petitioner's president signed the agreement because he believed it to be for the best interest of petitioner. This stipulated fact may, if necessary, be supplemented by matters as to which we would take judicial notice, although there is ample testimony in the record to prove all of the necessary facts. Thus, it is a matter of common knowledge that in the fall of 1931 the banking situation throughout the country was in a precarious condition. Large and important banks, many of which had been in existence for decades, were closing, never to reopen. Bank failures during the year 1931 were twice as numerous as during the preceding year, almost four times as numerous as during the year 1929, and almost six times as numerous as during the average of predepression years. The then president of the St. Louis Clearing House Association stated that the whole situation was "very serious. Very acute; runs on banks were frequent and many, and the public was very nervous over the general situation financially." He stated it was his opinion, when the meeting of business men was held in December of 1931, and he so advised them, that the failure of Franklin-American "would probably bring the failure of other banks and a general run on the various banks." This, then, was the general picture when they were asked to sign the agreement and to deposit with the absorbing bank the amounts of their subscriptions.

Respondent argues that the agreement constituted a contract of indemnity without consideration inuring to petitioner; that petitioner

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) Expenses.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

was not engaged in the indemnity or guaranty business; and that the payment was made purely as a "matter of civic pride." Upon brief he says: "How can it be said that participation by petitioner in a 'rescue party' for a bank with which it had no direct financial relations, no deposits, nor stock, was an ordinary or necessary expense of this business concern?"

It is true that petitioner was not engaged in the indemnity or guaranty business. Petitioner does not contend that the amount is deductible as an expenditure made in carrying on such business. It contends that the payment was made for its own benefit; to preserve, protect, and promote its own business of manufacturing and selling containers. As pointed out by this Board in *Edward J. Miller*, 37 B. T. A. 830, 833, "Many expenditures made without legal compulsion are deductible, such as insurance premiums on business property, bonuses to a taxpayer's employees, donations resulting in business benefits, and numerous others." Of course, if the payment is made for the acquisition of a capital asset it is not deductible.

What constitutes an ordinary and necessary expense has been passed upon in many cases. Many of them are cited in *First National Bank of Skowhegan, Maine*, 35 B. T. A. 876, some of the more important being *Kornhauser v. United States*, 276 U. S. 145; *Helvering v. Community Bond & Mortgage Co.*, 74 Fed. (2d) 727; *Welch v. Helvering*, 290 U. S. 111; and *Deputy v. du Pont*, 308 U. S. 488.

That the expenditure in question was deemed by the taxpayer to be necessary for the protection of its own business can not be doubted. The fact that it had no direct financial stake in the Franklin-American Bank is not determinative. The effect of the failure of this bank upon petitioner's business might well have been considerable. As pointed out by its president, it stood to lose upwards of a quarter of a million dollars through the collapse of the financial institutions of the community, which at that time was imminent. If the guaranty had not been raised and the apprehended collapse had occurred, it is entirely possible that petitioner's business would have been wiped out. This must have been in the minds of the officers and directors of petitioner when they authorized the agreement to be signed and the amount to be deposited. We think it must be held, therefore, that the expenditure was a "necessary" one.

Whether the expenditure was or was not an "ordinary" one presents more difficulty. The Supreme Court pointed out in *Welch v. Helvering, supra*, that ordinary "does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often." Referring to the expenditure of heavy counsel fees in connection with a lawsuit affecting the safety of a business,

the Court characterized such a payment as an ordinary expense because of the fact that it is "the common and accepted means of defense against attack."

In the recent case of *Deputy* v. *du Pont, supra,* the Court quoted with approval its language in *Welch* v. *Helvering*: "What is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance." It refused to permit the deduction from the taxpayer's gross income of amounts paid by him to a corporation for the loan of certain shares of stock, borrowed by him for the purpose of selling it to some executives of a company in which he had substantial interests, pointing out that there was "no evidence that stockholders or investors, in furtherance of enhancing and conserving their estates, ordinarily or frequently lend such assistance to employee stock purchase plans of their corporations." It said: "In the absence of such evidence there is no basis for an assumption, in experience or common knowledge, that these payments are to be placed in the same category as typically ordinary expenses of such activities, e. g., rental of safe deposit boxes * * *." The Court was careful not to overrule *Welch* v. *Helvering, supra,* however, and reiterated that: "It is the kind of transaction out of which the obligation arose and its normalcy in the particular business which are crucial and controlling."

Was the transaction out of which the obligation in question arose, normal? In other words, was it, in the language of *Welch* v. *Helvering, supra,* the "common and accepted means of defense" adopted by corporate businesses generally when faced with a situation such as that which confronted the business men of St. Louis in 1931? We think that both questions should be answered in the affirmative. It will be recalled that the states had found it to be impracticable, or at least unworkable, to insure bank deposits. Nor had any plan been devised under which they, either alone or in conjunction with existing financial institutions, could take over the affairs of a bank, except through receivership, which was well known to be an expensive proceeding not conducive to continued faith in such institutions. The Federal Government had not, as yet, undertaken to insure bank deposits or to render aid to distressed banks and financial institutions either directly or through governmental agencies, nor had any provision been made whereby a bank might avail itself of the modicum of protection now given to corporations under sections 77 (a) and 77 (b) of the Bankruptcy Act. In other words, banks and financial institutions were dependent first upon their own assets and secondarily upon such assistance as they might receive, in times of stress, from their officers, directors, and stockholders, from other banks, and from cor-

porations and individuals who came to their rescue either as a gesture of friendship or more frequently, as in the instant proceeding, as a matter of self-defense. The plan, devised and followed by the banks and business men of St. Louis, or some modification or variation of it, was being carried out in many sections of the country. Cf. *O'Connor v. Bankers Trust Co.*, 289 N. Y. S. 252; *First National Bank of Skowhegan, Maine, supra.* We think therefore it can not be gainsaid that in December of 1931 the transaction entered into by this petitioner was both "normal" and constituted a then "common and accepted means of defense" to protect it and its business from an imminent loss.

In *First National Bank of Skowhegan, Maine, supra*, the facts were somewhat analogous to those in the instant proceeding. A national bank paid the sum of $10,000 to another bank in consideration of its taking over the assets and assuming the liabilities of a local bank, thus obviating the failure of the local bank. It was held, as succinctly stated in our headnote: "Since the expenditure was made to protect petitioner's business, its depositors, and its stockholders, it is an ordinary and necessary expense within the meaning of section 23 (a)  *  *  *." The Commissioner acquiesced in our decision and apparently does not now contend that it is wrong. He attempts to distinguish it from the instant proceeding on the ground that the participation in the "rescue party" in that case was by a bank, whereas the "petitioner here was a manufacturing and selling corporation with no direct interest in the distressed bank and the effect of its being closed upon petitioner's business was remote." The distinction, we think, is without substance. The closing of Franklin-American, even assuming that it did not result in the closing of other banks, would have had a direct effect upon a substantial portion of petitioner's accounts receivable. To that extent at least, its closing would have affected petitioner's business adversely; but, as we have pointed out above, the general condition of the country was such that the closing of this bank would probably, as prophesied by the president of the Clearing House Association, have resulted in runs upon, and the closing of, other banks in the city, and this would have been disastrous to petitioner's business.

We are of the opinion and hold that the amount in question is deductible as an ordinary and necessary expense of carrying on petitioner's trade or business.

Reviewed by the Board.

*Decision will be entered for the petitioner.*

ARUNDELL, STERNHAGEN, MURDOCK, ARNOLD, and OPPER concur only in the result.