C. DORIS H. PEPPER AND MORTON PEPPER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

R. LAWRENCE SIEGEL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 70630, 70915. Filed August 28, 1961.

*Benjamin Pepper, Esq.*, for the petitioners.
*Paul D. Barker, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioners' income tax liability for the calendar years 1953 and 1954 as follows:

|  | Year | Deficiency |
|---|---|---|
| C. Doris H. Pepper and Morton Pepper—Docket No. 70630 | 1953 | $2,598.14 |
|  | 1954 | 2,187.10 |
| R. Lawrence Siegel—Docket No. 70915 | 1953 | 1,152.32 |

The issue for determination is:

(1) Whether certain payments are deductible as ordinary and necessary business expenses;

(2) Alternatively, whether the payments are deductible as a loss incurred in a trade or business;

(3) Alternatively, whether the payments are deductible as debts incurred in a trade or business; or

(4) Alternatively, whether the payments are deductible as a nonbusiness bad debt.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

Petitioners in Docket No. 70630, Morton Pepper (hereinafter sometimes referred to as Morton) and C. Doris H. Pepper (hereinafter sometimes referred to as Doris), are husband and wife, both of whom reside in New York City, New York. For the calendar years 1953 and 1954, they filed joint Federal income tax returns with the district director of internal revenue, Upper Manhattan District, New York, New York.

Petitioner in Docket No. 70915, R. Lawrence Siegel (hereinafter sometimes referred to as Siegel), is an individual residing in New York City, New York. For the calendar year 1953, Siegel filed his

Federal income tax return with the district director of internal revenue, Upper Manhattan, New York, New York.

From 1950 to 1954, Pepper and Siegel were engaged in a partnership organized for the general practice of law. They were the only members of the firm known as Pepper & Siegel (hereinafter sometimes referred to as the partnership).

David K. Spiegel (hereinafter referred to as David) was an associate professor of economics at Pratt Institute. Morton confirmed David's position and standing at Pratt Institute by inquiry of the chairman of the Department of General Studies. Sometime prior to November 1952, David had spoken to Doris, who was also a professor at Pratt Institute, about consulting Morton concerning legal representation. One afternoon, late in November or early December 1952, David telephoned Morton for an appointment. David informed Morton that, in order to supplement his income, he was engaged in the business of jobbing plastic housewares to retailers. David stated that he had very little cash and, therefore, could not get credit from his suppliers. He stated that he wanted to borrow money on a 30-day basis, and would give as security assignments of invoices representing sales of merchandise by him. He also stated that since his overhead and expenses were very low he could pay a substantial rate of interest on loans. Morton saw David's office, the warehouse, and the cartons in which a small amount of inventory was purportedly stored. Morton indicated to David that he would endeavor to find lenders for his venture.

Morton contacted various people, including his own clients, potential clients, and friends, to see if they were interested in making loans. Some of these people were interested in making loans, while others were not. Of those who were interested, some wanted to meet David to size the matter up for themselves. Those lenders who met David were impressed by the soundness of the transaction as explained by him. Some of them also saw his office.

The loans in question were made to Plymouth Creations, Inc. (hereinafter referred to as Plymouth Creations), of which David was the president and sole stockholder. The lenders made their checks payable to Pepper & Siegel, who deposited them in the partnership trust account. The details of these transactions, including the payment of the moneys to Plymouth Creations, were handled by Morton. For each loan, a note was given by Plymouth Creations, signed by David as president and secured by the assignment of invoices.

The loans were all for 30 days. When the 30 days expired, the interest in each instance was paid. Until the financial collapse of Plymouth Creations and David in October 1953, the loans, upon

maturity, were renewed or repaid, depending on the wishes of the lender.

After a few months, Morton consulted his accountant concerning the business which Plymouth Creations was conducting. The accountant thought it was a reasonable way to conduct the business, but rather expensive. The accountant also stated that he had talked with a buyer for a large mail-order house who informed him that there was a real need for jobbers of plastic housewares for large buyers. Morton also discussed, with the accountant, the possibility of setting up the business on a permanent basis.

As a result of Morton's efforts, approximately 30 persons, clients, business and personal friends and acquaintances, and office associates, made loans to Plymouth Creations totaling approximately $191,000. All of these loans were made through the office of Pepper & Siegel, who acted as a conduit for transferring the money and procuring the necessary documentation and security in the form of promissory notes and assignments of invoices. In general, all papers and records were retained in the office of the partnership, which supervised and administered the various transactions, kept records, advised the lenders when their loans were due, procured and transferred payments or arranged to reinvest the payments in new loans.

During 1953, certain individuals made loans to Plymouth Creations. The lenders, the dates of the loans, the principal amount of the loans, and the amount of the notes are as follows:

| Lender | Date of loan | Principal amount | Amount of note |
|---|---|---|---|
| | *1953* | | |
| Harold C. Mayer | October 2 | $1,000 | $1,100.00 |
| Harold C. Mayer | September 8 | 2,000 | 2,200.00 |
| Harold C. Mayer | September 17 | 4,000 | 4,400.00 |
| Henry Hofheimer, Jr | September 14 | 1,000 | 1,100.00 |
| Henry Hofheimer, Jr | September 14 | 2,000 | 2,250.00 |
| Henry Hofheimer, Jr | September 28 | 2,000 | 2,200.00 |
| Bernard Gartlir | September 21 | 3,000 | 3,300.00 |
| Gerald P. Halpern | September 16 | 3,000 | 3,375.00 |
| Jack L. Kanuck | September 2 | 1,000 | 1,100.00 |
| Sidney Buchman | September 9 | 2,000 | 2,250.00 |
| Sidney Buchman | September 12 | 2,000 | 2,250.00 |
| Rose Halpern | September 21 | 1,000 | 1,125.00 |
| Benjamin Miller | September 21 | 1,500 | 1,650.00 |
| Benjamin Miller | September 9 | 1,000 | 1,100.00 |
| Gertrude Samuels | September 25 | 2,000 | 2,250.00 |
| Gertrude Samuels | September 23 | 2,000 | 2,250.00 |
| Sylvia Hodes | September 25 | 1,500 | 1,687.50 |
| Lillian B. Schmeidler | September 28 | 1,000 | 1,025.00 |
| The Vanguard Press | October 3 | 2,500 | 2,750.00 |
| Samuel Mostel | September 17 | 2,000 | 2,250.00 |
| Sam Jaffe | September 15 | 2,000 | 2,250.00 |
| Marianne Graham | October 2 | 2,000 | 2,250.00 |
| Ileana Castelli | September 29 | 2,500 | 2,812.50 |
| Marcia Ben Ami | October 5 | 2,000 | 2,250.00 |
| Marcia Ben Ami | September 21 | 3,000 | 3,375.00 |
| Lewis L. Bredin | September 28 | 5,000 | 5,750.00 |
| Lewis L. Bredin | September 2 | 10,000 | 11,250.00 |
| Gloria Swanson | October 1 | 4,000 | 4,500.00 |

Pepper & Siegel received approximately $13,000 in fees from Plymouth Creations for their services. These services consisted of finding

the money and obtaining the loans, drawing up all necessary notes, assignments, and other documents; handling all mechanical and record-keeping details in connection with the making of the loans and with the repayment thereof.

On Friday, October 9, 1953, while they were having lunch, David informed Morton that some of the invoices were fictitious. Morton returned to his office with David and informed him that he would have to execute assignments for the benefit of creditors of everything that he had and his mother and wife would have to do the same. By agreement dated October 9, 1953, Plymouth Creations, David, Toby G. Spiegel (hereinafter referred to as Toby), his wife, Jeannette G. Spiegel (hereinafter referred to as Jeannette), his mother, and Sylvia Steinberg, his sister-in-law, made assignments of all their respective assets to Pepper & Siegel for the benefit of creditors of Plymouth Creations.

By separate agreement dated October 9, 1953, between Plymouth Creations, David, and Morton on behalf of Pepper & Siegel, David and Plymouth Creations agreed to immediately remit all moneys and funds possessed by them, due to them, received by them from whatsoever source to Pepper & Siegel, as agent, to meet the obligations of Plymouth Creations. David and Plymouth Creations by two further agreements dated October 9, 1953, made further assignments to Pepper & Siegel for the benefit of creditors.

Also on the morning of October 10, 1953, Jeannette executed a demand promissory note to Pepper & Siegel in the amount of $50,000 and a check in the amount of $5,000. Pursuant to the aforementioned agreements, Pepper & Siegel also received certain pieces of jewelry from Jeannette and Toby which were subsequently turned over to the attorney for the receiver in bankruptcy. The first banking day after Morton got Jeannette's check for $5,000 and note for $50,000, which was Tuesday, October 13, 1953, Morton went to the drawee bank. The bank refused to honor the check and told him there was no hope of collecting the note.

At the time of the assignments for the benefit of creditors, Morton had demanded from David whatever funds he had on deposit. David, however, had only $20 in cash, and his checks were being dishonored.

Plymouth Creations was adjudicated bankrupt in the United States District Court for the southern district of New York on October 19, 1953, after the filing of an involuntary petition by creditors. These creditors were a group of lenders separate and apart from those represented by Pepper & Siegel. Their claims, as disclosed by the bankruptcy files, amounted to approximately $200,000.

Morton and Siegel came to the conclusion that it was imperative, if they were to save their law practice, that they prevent those people who had outstanding loans to Plymouth Creations from losing their

money. During 1953, the partnership paid the following amounts to the creditors of Plymouth Creations:

| Payee | Date of check | Amount | Payee | Date of check | Amount |
|---|---|---|---|---|---|
| | 1953 | | | 1953 | |
| Henry Hofheimer, Jr. | October 15 | $4,800 | Samuel Mostel | November 2 | $2,000 |
| Bernard Gartlir | October 15 | 2,700 | Sam Jaffe | November 23 | 2,000 |
| Gerald P. Halpern | October 19 | 3,000 | Marianne Graham | November 4 | 2,000 |
| Jack L. Kanuck | October 19 | 1,000 | Ileana Castelli | November 4 | 2,500 |
| Sidney Buchman | October 21 | 4,000 | Marcia Ben Ami | November 4 | 5,000 |
| Rose Halpern | October 22 | 1,000 | H. C. Mayer, Jr. | November 16 | 5,400 |
| Benjamin Miller | October 23 | 2,100 | Lewis L. Bredin | December 8 | 5,000 |
| Gertrude Samuels | October 26 | 4,000 | Lewis L. Bredin | December 8 | 8,000 |
| Sylvia Hodes | October 26 | 1,500 | Lewis L. Bredin | October 21 | 6,000 |
| Lillian B. Schmeidler | October 30 | 1,000 | | | |
| The Vanguard Press | November 2 | 2,750 | | | 65,750 |

Of the foregoing persons, to whom loans were repaid, the following were not and had never been clients of Pepper & Siegel:

(1) Henry Hofheimer, Jr., and Bernard Gartlir—members of the firm of Hofheimer, Gartlir & Hofheimer who had sent legal business to Morton and had associated him with themselves on various matters.

(2) Benjamin Miller—a stockbroker, a graduate of Harvard College, and Harvard Business School, an old friend of Morton's.

(3) Harold C. Mayer, Jr.—a friend of Benjamin Miller, a businessman looking for a business to invest in. Mayer and Miller seriously contemplated financing a new company with David to operate the business of Plymouth Creations and Pepper & Siegel were to be counsel to this new company.

(4) Sam Jaffe—a close friend of Samuel Mostel who was himself a client.

(5) Gerald Halpern—senior legal associate of the firm of Pepper & Siegel. Rose Halpern was his mother.

(6) Gertrude Samuels—an employee of the firm of Pepper & Siegel. Sylvia Hodes—a friend of Gertrude Samuels.

(7) Jack L. Kanuck—a friend of Gerald Halpern's. In the case of each repayment by Pepper & Siegel of loans or portions thereof, they received a written assignment of the lender's claim against Plymouth Creations and subsequently filed a claim in the bankruptcy proceedings. All assignments were made after the date of the filing of the petition in bankruptcy except those of Henry Hofheimer, Jr. (hereinafter referred to as Hofheimer), and Bernard Gartlir. These latter assignments were effectuated by endorsement in blank and delivery to Pepper & Siegel of the notes from Plymouth Creations held by them.

Subsequent to the foregoing events, David pleaded guilty to an indictment for first degree larceny and was sentenced to prison.

The repayment, by the partnership of Pepper & Siegel, of loans made to Plymouth Creations constituted an ordinary and necessary business expense.

Petitioners in Docket No. 70630 assign no error to the adjustment described in the deficiency notice as "(b) Partnership income $3,784.26," except that respondent concedes the correct amount should be $3,775.05. This will be given effect under a Rule 50 computation.

Section 23(a)(1)(A) of the 1939 Code provides, in part, that a deduction shall be allowed for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. To be deductible, an expense must be both "ordinary" and "necessary." *Welch* v. *Helvering*, 290 U.S. 111 (1933). In addition, the expense must have arisen out of the taxpayer's trade or business.

In 1953, the partnership of Pepper & Siegel paid certain individuals a total of $65,750. This was to repay these individuals for money they had loaned to Plymouth Creations. It is the contention of the petitioners that this money was paid in order to protect their trade or business, and, as a consequence, is deductible as an ordinary and necessary business expense. It is respondent's contention that the voluntary payment of the obligations of others is not deductible. Respondent also contends that even if it be assumed that the expenses were "necessary," nevertheless they were not "ordinary." Furthermore, respondent contends that the expenses did not arise out of the practice of law.

We must first determine whether these expenses arose out of petitioners' trade or business, for if they did not, whether they were ordinary and necessary is immaterial. Respondent has seized upon one phase of petitioners' activities, that is, assisting David in obtaining financing for his business, and has characterized this as something other than the practice of law. We are not disposed to analyze, separately, each thing the petitioners did for the purpose of hanging a label on it. We are here concerned with what petitioners' "trade or business" was in 1953. It is true that the practice of law comes the closest to describing petitioners' "trade or business," yet nowhere in the Code, regulations, or decided cases is there authority for stereotyping the profession. There is more to the modern day practice of law than just reading cases, writing briefs, and appearing in trials. There are many things that are not in the purest sense the practice of law, nevertheless, they are so integrally connected with it as to be inseparable from it. An attorney may entertain a client or prospective client. Certainly, this is not what one would ordinarily think of as the practice of law, yet there is little doubt that it may be an ordinary and necessary expense which arises out of his trade or business. Review of the many decided cases is of little aid since each case turns on its own facts.

Morton testified that there had been several other instances in his practice where he has found financing for clients. One involved an

inventor seeking funds for the production and promotion of a new moving picture camera; another involved an oil operator who was organizing syndicates to prospect for oil; and still another involved the organizing of a music-publishing company. Benjamin Miller, a member of the New York Stock Exchange testified that, in his experience, it was not unusual or uncommon for people to seek financing for their business requirements through lawyers. In fact, he testified that "they [lawyers] and the accountants are the most fruitful sources of getting people together." Hofheimer, a practicing attorney in New York, testified that he and his firm, in many instances, actively sought out financing for clients. When asked whether this kind of activity is ordinary common practice for lawyers, he testified as follows:

From my experience, it is, and I believe from what I know from friends of mine who are practicing law in New York that this is a regular part of their practice, as well.

\* \* \* \* \* \* \*

\* \* \* As a matter of fact, this is one of the ways, and I think an important way, that a lawfirm expands its business, because when you put people who have money together with people who need money, you have contact with people who later develop into regular and more active clients if they were regular clients before.

James Linburn, who practiced law in New York for about 4 years and is now a registered representative of a New York Stock Exchange firm, was asked whether in his experience it is common for lawyers to be engaged in this kind of financial work. He testified that "it definitely was, because the fact is that a lawyer is not able to advertise, he had to develop clients by some means, unless he uses his training, his intelligence—you can have the best brains in the world, but if you have no clients, this is not a very valuable asset." Morton also testified that Benjamin Miller and a friend of his, Harold C. Mayer, Jr., wanted to invest, rather than loan, $40,000 in Plymouth Creations. Morton testified that had the investment been consummated, they would have retained him as legal counsel.

In addition to securing lenders for Plymouth Creations, Pepper & Siegel also drew up assignments and other legal instruments. During the time they represented Plymouth Creations, they received approximately $13,000 in fees.

Based on the record before us, we are convinced that the transaction which gave rise to petitioners' payments to the creditors of Plymouth Creations arose out of petitioners' "trade or business."

We may assume that the payments to the creditors of Plymouth Creations were necessary, at least in the sense that they were appropriate and helpful. The petitioners certainly thought they were and we should be slow to override their judgment. *Welch* v. *Helvering*, *supra*.

What is "ordinary," though there must always be a strain of constancy within it, is nonetheless a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. One struggles in vain for any verbal formula that will supply a really appropriate touchstone. The standard set up by the statute is not a rule of law, it is rather a way of life. Life in all its fullness must supply the answer to the riddle. *Welch* v. *Helvering, supra.*

After the swindle was discovered, Morton called Hofheimer, not as an investor, but as a friend. They discussed the nature of petitioners' responsibility to the people who had lost money. Hofheimer agreed with Morton that the partnership of Pepper & Siegel was obligated to repay the money. On cross-examination, when asked about what he meant by "obligated," Hofheimer testified as follows:

Because he had recommended this investment and as it unfortunately turned out, the borrower was a dishonest person. I told him then and I still feel that is a risk that an attorney runs when he recommends to anyone that money be invested with a dishonest client.

Q. By that, you mean a moral obligation?

A. I certainly mean a moral obligation, but I think I mean more than that. I think there is a legal responsibility on Mr. Pepper. I think that he was legally obligated to pay that money.

Morton also testified that he and Siegel decided it was necessary in order to protect their practice to repay the creditors of Plymouth Creations. His testimony is as follows:

A. We decided that it was imperative if we were to save our practice, our law practice, that we should prevent those people who had outstanding loans to Plymouth Creations from losing their money. We decided the only way that could be done was by repaying those loans ourselves. We decided that unless we paid these loans, we would lose our practice; we would lose our clients; it would be impossible for us to continue as lawyers in New York City.

Q. Did you come to that conclusion in good faith and as a matter of your best judgment?

A. We certainly did. It was a very large undertaking for us to make these payments. As a matter of fact, we had to borrow the money. We are still repaying it, and we did it only because we felt that was the only way of saving the means of earning our living.

Based on the entire record before us, we conclude that the payments made by petitioners were an ordinary expense of their trade or business. Expenditures by a taxpayer to protect an established business are fully deductible as ordinary business expenses. See *Edward J. Miller*, 37 B.T.A. 830 (1938); *Robert Gaylord, Inc.*, 41 B.T.A. 1119 (1940); *Scruggs-Vandervoort-Barney, Inc.*, 7 T.C. 779 (1946); *Catholic News Publishing Co.*, 10 T.C. 73 (1948); *Charles J. Dinardo*, 22 T.C. 430 (1954); *L. Heller & Son, Inc.*, 12 T.C. 1109 (1949); and *Cubbedge Snow*, 31 T.C. 585 (1958).

Respondent's contention that the deduction to petitioners should be disallowed because voluntarily made is without merit. Morton admitted that they were not guarantors, nor were they under any legal obligation to repay the loans. However, there is no requirement that there must be an underlying legal obligation to make an expenditure before it can qualify as an ordinary and necessary business expense under section 23 (a) (1) (A), *supra*. The basic question is whether, in all the circumstances, the expenditure is ordinary and appropriate to the conduct of the taxpayer's business. *Waring Products Corporation*, 27 T.C. 921 (1957); *Champion Spark Plug Co.*, 30 T.C. 295 (1958), affd. 266 F. 2d 347 (C.A. 6, 1959).

We also think that *Welch* v. *Helvering*, *supra*, and *Friedman* v. *Delaney*, 171 F. 2d 269 (C.A. 1, 1948), relied on by respondent are distinguishable. In *Welch* v. *Helvering*, *supra*, the taxpayer paid portions of the claims of former customers of a bankrupt corporation, of which he had been secretary, in order to strengthen his individual standing and credit, and to reestablish business relations with the corporation's former customers. The Court held that such expenditures were not deductible as ordinary and necessary business expenses. However, unlike the situation in the instant case, the expenditures there involved were made to *acquire*, and not to *retain or protect*, the taxpayer's business. In *Friedman* v. *Delaney*, *supra*, the taxpayer was an attorney representing an insolvent client, whose proposed composition in bankruptcy required the deposit in court of $7,000. In February 1938, Friedman deposited $5,000 of his own money with a caveat to the effect that no part of the money came from Wax (the client) or his estate. In November 1939 Friedman entered a petition in the bankruptcy court alleging "that the money deposited for the proposed composition, which has been abandoned," was deposited by him and was not the property of the bankrupt, and asking that it be ordered returned. The petition was denied and later Friedman filed another document with the court stating that he would not further oppose the transfer of his funds to the trustee in bankruptcy. It appears that Friedman furnished this money for the reason that, in conversations with attorneys for creditors, when he was urging the acceptance of the proposed composition, he had personally assured them that the money to carry it out would be forthcoming. He did this without informing Wax, and without intending to subject him to any legal liability, presumably feeling that the money would be obtained from a certain life insurance policy. However, Wax refused to surrender the policy and there was no money forthcoming. Friedman attempted to deduct the $5,000 as an ordinary and necessary business expense. His contention was that the $5,000 was expended due to his keeping his word, which the ethics of his profession, as well as his own conscientiousness, compelled him to do. The court held

that the moral obligation which Friedman recognized was an extra-professional liability and did not give rise to a deduction. Judge Magruder concurring pointed out, at page 272:

> However unfortunate the giving of this assurance may appear in retrospect, under the circumstances at the time it seems to me a natural, certainly not an extraordinary, thing for Friedman to have done in the service of his client. And having given the assurance, I further think it was not unreasonable for Friedman to regard it as a matter of professional honor, in the maintenance of his good will and standing at the bar, to make good on that assurance.

He went on to say:

> If these were all the relevant facts, I should hate to have to hold that the payment of $5,000 by Friedman under the circumstances stated was not an "ordinary and necessary" expense paid in carrying on his professional business. * * *

However, Judge Magruder pointed out that:

> The record is silent as to the reasons which led Friedman to agree in 1941 that the $5,000 deposit (to the return of which he was clearly entitled upon the failure of its purpose) should be turned over to the trustee in bankruptcy to be dealt with without restriction as part of the bankrupt's estate. * * * As above stated, the composition was never consummated and Wax was adjudicated a bankrupt. Friedman's relinquishment in 1941 of his claim for refund of the $5,000 deposit can therefore not be deemed to have been an ordinary and necessary expense by way of fulfilling a professional commitment made in the course of his practice of the law—which is the main ground urged by Friedman in support of his claim that the $5,000 item was properly deductible. Nor was the $5,000 item deductible under I.R.C. § 23(e)(1) as a "loss" incurred in trade or business. * * *

*Friedman* v. *Delaney, supra*, is distinguishable because there was no contention that the money involved was paid to protect or promote Friedman's business. The court expressly found that what Friedman did was "extraordinary." In the instant case, the record conclusively establishes that the expenditures in question were essential to the very continuance of the petitioners' practice, for the protection of their means of livelihood.

We need not consider petitioners' alternative contentions. We hold that the respondent's disallowance of petitioners' claimed deduction was erroneous.

> *Decision will be entered under Rule 50 in Docket No. 70630.*
> *Decision will be entered for the petitioner in Docket No. 70915.*