Interstate Drop Forge Company v. Commissioner.
Interstate Drop Forge Co. v. Commissioner
Docket No. 92172.
United States Tax Court
T.C. Memo 1963-149; 1963 Tax Ct. Memo LEXIS 195; 22 T.C.M. (CCH) 701; T.C.M. (RIA) 63149; May 29, 1963
Thomas J. Donnelly, Jr., 756 N. Milwaukee Ave., Milwaukee, Wis., and Patrick W. Cotter for the petitioner. William J. Wise for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in the income tax of petitioner for the year 1957 in the amount of $15,600. The sole issue for decision is whether petitioner is entitled to deduct from income for the year 1957 a $30,000 payment which it made during the year to the widow of Charles E. Stone, its deceased president, "in gratitude for his outstanding service to the corporation." Findings of Fact Some of the facts were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by reference. Petitioner is a Wisconsin corporation, organized in 1922, and has as its *196 principal business the manufacture of steel drop and upset forgings. Its return for the year 1957, made on the accrual basis and for the calendar year period, was filed with the district director of internal revenue, Milwaukee, Wisconsin. Prior to his death in December of 1956 Charles E. Stone had been, for some 29 years, president of petitioner. Having first come with the company in the early 1920's as a part time consultant, he assumed its presidency in 1927 during a period of serious financial difficulty. He was a dynamic leader and as a direct result of his excellent management petitioner was able not only to solve its financial problems but also to become a very properous and profitable organization. Unquestionably, petitioner's stockholders, whose investment had formerly been in jeopardy, upon finding that investment to have multiplied in value many times as a result of his efforts, felt deeply indebted to Charles E. Stone. During the years 1947 through 1956 petitioner had profits, after taxes, in the following amounts: Year
Profits
Year
Profits
1947
$199,296
1952
$238,105
1948
251,554
1953
263,143
1949
156,251
1954
286,805
1950
242,929
1955
371,531
1951
236,457
1956
615,428
*197 As petitioner's president, Charles E. Stone was paid a salary plus what was known as "provisional additional compensation" based upon the annual earnings of petitioner. For the years 1947 to 1956, inclusive, Stone received as compensation from petitioner the amounts set forth below: Provisional
Base
Additional
Year
Salary
Compensation
Total
1947
$18,000.00
$11,176.14
$29,176.14
1948
18,000.00
24,300.01
42,300.01
1949
18,000.00
19,216.28
37,216.28
1950
18,333.36
30,971.97
49,305.33
1951
20,000.00
38,864.72
58,864.72
1952
20,000.00
27,404.00
47,404.00
1953
20,000.00
32,336.00
52,336.00
1954
18,000.00
26,259.00
44,259.00
1955
30,000.00
18,545.00
48,545.00
1956
30,000.00
29,166.00
59,166.00 The parties agree, and we find as a matter of fact, that Charles E. Stone was sufficiently compensated during his lifetime for the work which he performed for petitioner. On December 18, 1956, Charles E. Stone died. His death was unexpected. At the time, petitioner's board of directors, scheduled to meet that month, consisted of seven men not including Stone. The majority of these men were not only among the original stockholders *198 of petitioner but had also been closely related to Charles E. Stone throughout his working lifetime. Only one of the directors, however, was a member of Stone's family - his son, Charles W. Stone. Because of the death of its president, petitioner's board of directors cancelled their meeting for the month of December. When next they met again, on January 29, 1957, petitioner's board of directors elected Charles W. Stone president of petitioner. Without discussion, they also adopted the following resolution: RESOLVED, that the Officers and Directors of Interstate Drop Forge Company, express and record their deep appreciation of the thirty-six years of devoted service that have been rendered by our late President, Charles E. Stone, to the stockholders of this Company, through his wise, energetic and successful leadership of this industry. We feel, too, an individual loss of his delightful companionship. In gratitude for his outstanding service to the Corporation, which extends back to the founding of the Company, we authorize and direct the Management to give to his widow, Queen R. Stone, out of corporate earnings, the sum of money equal to Mr. Stone's base salary for the year 1956. *199 This payment is considered a gratuity and is in no way related to future service to the Company. As of the date of this resolution petitioner had no policy with respect to payments to widows, nor was any such policy specifically formulated at the time the resolution was offered. However, at least three members of petitioner's board of directors, present at the above referred to meeting, were members of the board of other corporations which did have such a policy. The resolution of January 29, 1957, was prompted solely out of gratitude for the outstanding service which Charles E. Stone had rendered to petitioner. On March 19, 1957, Queen R. Stone received from petitioner the sum of $30,000. This payment in no way represented additional compensation paid on account of Charles E. Stone, nor in making it, were the needs of Queen R. Stone, his widow, in any way considered. As of January 29, 1957, petitioner had 100,000 shares of capital stock outstanding. Of this number some 37 percent was owned together by Queen R. Stone, Charles W. Stone, her son, and his family, and the estate of Charles E. Stone. The remaining 63 percent of the shares were broadly held by over sixty other stockholders *200 apparently unrelated to the Stones. The following dividends were paid by petitioner on its shares of stock for the years 1952 to 1956, inclusive: 1952
$ 79,280
1953
52,000
1954
80,000
1955
88,000
1956
115,000
On Schedule K of its return for the year 1957 petitioner deducted the $30,000 payment to Queen R. Stone as a business expense under the heading "Payment to widow." In his notice of deficiency respondent disallowed this deduction on the ground that petitioner had failed to establish that it was entitled to the same. Ultimate Finding of Fact Petitioner has failed to prove that the payment of $30,000 to Queen R. Stone, widow of its president Charles E. Stone, "in gratitude for his outstanding service to the corporation," was an ordinary and necessary expense of its business within the meaning of section 162, Internal Revenue Code of 1954. Opinion Whether a payment by a corporation to the widow of a deceased officer is a deductible expense of the corporation is a question not unique in this Court. Mobile Bar Pilots Association, 35 B.T.A. 12 (1936); McLaughlin Gormley King Co., 11 T.C. 569 (1948); *201 I. Putnam, Inc., 15 T.C. 86 (1950); Philadelphia-Baltimore Stock Exchange, 19 T.C. 355 (1952); Fifth Avenue Coach Lines, Inc., 31 T.C. 1080 (1959), affirmed in part and reversed in part on other issues, 281 F. 2d 556 (C.A. 2, 1960), certiorari denied 366 U.S. 964 (1961); Barbourville Brick Co., 37 T.C. 7 (1961). Here, as in Barbourville Brick, respondent presents two alternative grounds upon which his determination disallowing the expense may be sustained, viz., that the payment to the widow was a gift non deductible as an ordinary and necessary expense of petitioner's business, or, alternatively, was a preferential dividend and as such not a corporate expense. Petitioner does not deny that the payment may be characterized as a gift, but argues that, even so denominated, it was an ordinary and necessary expense of its business within the meaning of section 162. It is conceded by petitioner that the payment embodied no element of compensation, and we are convinced that its making was not prompted by any consideration of the recipient's needs. We are willing to assume, without deciding, that to be deductible *202 by the corporation, the payments need not have been in the nature of additional compensation, Fifth Avenue Coach Lines, Inc., supra, and that section 162, by its terms, does not preclude the deduction of corporate gifts as ordinary and necessary business expenses, Commissioner v. Duberstein, 363 U.S. 278 (1960). Still taxpayers claiming the benefits of section 162 must prove that they are clearly entitled to them. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The law provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred in carrying on a trade or business. An expense may be ordinary, although it is unique to the taxpayer, if it is common to the business community of which he is a part. And it may be necessary if it is appropriate and helpful. Welch v. Helvering, 290 U.S. 111 (1933). While necessary does not mean indispensable, it must appear affirmatively not only that there are business ends to be served, but also that there is an intention to serve those business ends, by means of the questioned expenditure. The plethora of cases involving payments to widows of corporate *203 executives, as well as the evidence before us indicating similar payments by corporations of whose boards three of petitioner's directors were members, allows us to assume, at least arguendo, the ordinary nature of the payment here involved. [1] A clear showing that this payment was intended to result in the inurement of a business benefit to petitioner would suffice to convince us that it was "appropriate and helpful." However, it is just this showing that petitioner has failed to make. Petitioner cites our decision in Fifth Avenue Coach, supra, for the proposition that a factor to be considered on the question *204 of the deductibility of widow payments as an ordinary and necessary business expense is the awareness, on the part of corporate directors, of the possible favorable effect created by the payment upon the morale and incentive of the corporation's other executives, and the benefit accruing therefrom to the corporation. And herein lies the crux of the whole matter. For if petitioner could clearly prove that the motivating force behind the resolution of January 29 was a desire on the part of the directors to improve executive morale and incentive, we might be satisfied, to some extent, that the payment was prompted by business considerations. But such proof petitioner has not offered. The testimony of four of the directors who were present at the January 29 meeting is in evidence. Each was asked in turn to relate the circumstances under which the payment in question was authorized by the board. Of the four, only one, Brinton Welser, offered any hint that the intent of the directors was "to provide an example for other outstanding employees, who had made similar accomplishments, in the future." H. C. Osborn, in answer to the question, "What was the purpose in authorizing this $30,000 *205 gift to Mrs. Stone?" replied, without more, "I felt, [and] I think the other directors felt, that an expression of gratitude was in order. This was our means, as far as I know." Osborn was aware of no previous widow payments by petitioner nor any policy to make them. Charles W. Stone, elected president of petitioner at the January 29 meeting, when asked, "What * * * was the purpose of authorizing this payment?" stated, "I can't of my personal knowledge say what the purpose was." Finally, the following colloquy, taken from deposition of John S. Owen, the fourth of the directors who testified, is an illustrative panorama of petitioner's entire case: Q. Will you state, Mr. Owen, what the purpose was in authorizing a payment of $30,000 by the corporation to Mrs. Queen R. Stone? * * *
A. Well, I understand that what was proposed was some recognition of all that Mr. Stone had done for the company and its stockholders. Q. Was the payment intended in any way to make up for any inadequacies in Charles E. Stone's compensation of prior years? A. I don't recall any discussion of that. The matter did not enter into it. Q. Were the financial circumstances or the financial needs *206 of Queen R. Stone considered or discussed or taken into account in any way by the Board of Directors? A. I recall no discussion of that. Q. In your experience on the Board of Directors, had any similar payments been made to the beneficiaries or the heirs of deceased executives? A. No. Q. In your experience on the Board of Directors have any payments been made to widows or heirs of deceased executives? A. I do not believe so. I don't recall any. Q. Have there been any deaths among the executive group since that time? A. I don't recall any prominently to come to my attention. Q. Would you say that Interstate has any sort of a policy to make payments to widows of deceased executives? A. Not that I know of. Q. Will you state what benefits the corporation might expect to derive from the payment made to Mrs. Stone? A. Well, only such benefits as are collateral to doing right things, proper things. Q. As a director of Interstate, did you consider that it was necessary for Interstate to make such a payment to Mrs. Queen R. Stone? A. No compulsion. Q. Well, I am not talking about now legal necessity. I am talking about business, in the exercise of business judgment *207 would you say that the payment should have been made to Mrs. Stone? * * *
A. You want to know whether I thought it was [the] expedient or proper thing to do? Q. Yes. A. Well, I agreed with my associates that it was a proper thing to do or I wouldn't have voted for it. Q. Was the fact that the payment was made to Mrs. Stone made known to the other members of the executive group of the company at that time? A. Well, I wasn't in a position and am not in a position to swear that this was done, but since two members of the executive group were on the Board it seems quite probable that it would become [known]. Such testimony is hardly the clear evidence which we believe necessary for predicating a finding of intention on the part of petitioner's directors that the payment in question should result in the inurement of a business benefit to petitioner. Petitioner argues that the payment was necessary because an "adverse effect * * * would be created if petitioner were to decide that so valuable a service as rendered by Mr. Stone should go unrecognized on the occasion of his death." However, petitioner has failed to establish the nature of this "adverse effect" either *208 in terms of possible loss of business, cf. C. Doris H. Pepper, 36 T.C. 886 (1961), or in terms of impairment of employee morale, cf. Dunn & McCarthy, Inc., 139 F. 2d 242 (C.C.A. 2, 1943) reversing a Memorandum Opinion of this Court. Moreover, and what is more important, petitioner has failed to convince us that in making the payment in question its directors were motivated by considerations of possible business adverse effects, whatever these might have been. Cf. Dun & McCarthy, Inc., supra. The proof being what it is, we are unable to find that petitioner has carried its burden of establishing the payment in question as an ordinary and necessary one within the purview of section 162. While not requisite to our decision disallowing the payment as an ordinary and necessary expense, so strongly has the respondent contended for recognition of it as a dividend that we feel compelled to comment upon this point. In this endeavor respondent's main reliance has been placed upon our decision in Barbourville Brick Co., supra, and the decision of the Court of Appeals for the Fifth Circuit in Lengsfield v. Commissioner, 241 F. 2d 508 (1957), *209 which affirmed a Memorandum Opinion of this Court. In Barbourville Brick the distribution held to be a dividend was to the widow of a corporate executive who for all intents and purposes was the sole shareholder of the corporation, while in Lengsfield, payments were made to three widows who together were not only the majority stockholders (63 percent) but to whom the other stockholders were closely related. While in the instant case Queen R. Stone, together with the Charles E. Stone estate and her son Charles W. Stone, owned 37 percent of petitioner's stock, we do not agree with respondent that this represented absolute control of petitioner, or "control" in any sense. Cf. Barbourville Brick and Lengsfield, supra.No relationship between the Stones and any of the sixty-odd shareholders owning the other 63 percent of petitioner's stock, often in sizable blocks, has been established by the evidence. Although all of the directors who voted the payment in question were stockholders of petitioner - and some acquired their interest long before Charles E. Stone became associated with the company - none but Charles W. Stone were actually related to the prospective recipient of petitioner's *210 largesse. While it is true that the rule of close-scrutiny applies to transactions between stockholder-officers and their corporations, Ox Fibre Brush Co. v. Blair, 32 F. 2d 42, 45 (C.A. 4, 1929), affirmed sub nom., Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930), petitioner's past dividend policy as compared with its earnings, see our findings, strongly negatives the casting of the instant payment as a disguised dividend. Cf. Fifth Avenue Coach Lines, Inc., supra.Whether or not a payment by a corporation is a dividend is a question of fact. It is our view that the facts in this case, taken as a whole, do not support the conclusion that the payment involved amounted to the distribution of a preferential dividend to Queen R. Stone. Because petitioner has failed to prove that its payment of $30,000 to the widow of its deceased president was an ordinary and necessary expense of its business within the meaning of section 162, Internal Revenue Code of 1954, Decision will be entered for the respondent. Footnotes
1. "Ordinary" though they may be, we note that in each of the cases involving the deductibility of such payments the critical inquiry has been whether the payment contained some element of compensation. Where the compensatory element was found to exist, deduction has been allowed, Fifth Avenue Coach Lines, Inc., supra.↩ Where no such element was found, deduction has been disallowed, Mobile Bar Pilots Association, McLaughlin Gormley King Co., I. Putnam, Philadelphia-Baltimore Stock Exchange, Barbourville Brick Co., (concurring opinion), all supra.