RONALD A. AND VALERIE J. JERICH, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jerich v. Commissioner
Docket No. 25612-89
United States Tax Court
T.C. Memo 1992-136; 1992 Tax Ct. Memo LEXIS 199; 63 T.C.M. (CCH) 2304; T.C.M. (RIA) 92136; March 9, 1992, Filed *199 Decision will be entered under Rule 155. Neal J. Shapiro and Saul A. Bernick, for petitioners. Gail K. Gibson, for respondent. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1983
$ 39,749.00
$ 8,202.75
$ 2,334.05
50% of the
interest due
on $ 32,868.00
1984
28,065.00
5,738.25
1,403.25
50% of the
interest due
on $ 22,953.00
1985
44,628.00
10,015.50
2,231.40
50% of the
interest due
on $ 40,062.00
1986
11,150.00
--   --   --
Additions to Tax
Year
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6654
Sec. 6661
1983
--  --    --   $  8,166.75
1984
--  --    $ 1,363.00
5,738.25
1985
--  --    2,228.00
10,015.50
1986
$ 557.50
50% of the    --   2,787.50
interest due on $ 11,150.00
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice *200 and Procedure. After concessions, the issue remaining for decision is whether petitioners' payment in 1986 on their guarantee of a debt of their wholly owned corporation is deductible as a business bad debt or as an expense paid or incurred in carrying on a trade or business. If petitioners may not fully deduct the payment, we must determine whether petitioners are entitled to deduct a portion of the payment as interest. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Anoka, Minnesota, at the time they filed their petition. In 1971, Ronald A. Jerich (petitioner) organized Midwestern Underground Construction Company, Inc. (Midwestern), a corporation in the business of laying underground cable. Petitioners were its sole shareholders. Petitioner's uncle managed the day-to-day business operations of Midwestern. Petitioner was an employee of Midwestern. Cable television was introduced to the Minneapolis-St. Paul, Minnesota, metropolitan area in the 1970s. Municipalities or groups of municipalities awarded cable franchises to cable companies. Storer Cable Communications *201 (Storer) was active in the cable business and bid on most of the franchises that were offered in the Minneapolis-St. Paul area. When Storer was awarded cable franchises, it subcontracted the work of laying the underground cable to other companies. Storer hired lobbyists to aid in its pursuit of cable franchises because the franchises were awarded based on a vote at the city council or established cable commission level. From 1979 through 1981, petitioner spent at least 1,000 hours lobbying on behalf of Storer, but petitioner was neither paid for his services nor reimbursed for his expenses. Storer promised petitioner that, if Storer was awarded cable franchises in the Minneapolis-St. Paul area, petitioner would be given preference for cable-laying contracts. Petitioner lobbied in his individual capacity and not as an employee of Midwestern or any other corporate entity. On April 27, 1981, Midwestern and petitioners, as borrower and guarantors, respectively, entered into an Agreement (the Agreement) with the First National Bank of Anoka (the Bank) regarding current indebtedness of Midwestern and an additional loan. The Agreement provided that the Bank would consider making an *202 additional loan to Midwestern in the amount of $ 100,000, with interest to accrue at the rate of 19-1/2 percent per annum. If such loan were made, petitioners would give the Bank a mortgage lien on their personal residence securing the amount of that loan. Upon payment to the Bank of any amount sufficient to reduce to $ 569,741.66 the unpaid balance owed by Midwestern to the Bank, the Bank would release the mortgage. The Agreement further provided that Midwestern and petitioners, as borrower and guarantors, respectively, were required to pay all costs, expenses, and attorney's fees incurred by the Bank in collecting any and all amounts due or to become due form Midwestern and petitioners to the Bank. At the time the Agreement was entered into, the value of Midwestern's assets had been appraised at $ 1,000,000. Petitioner, however, believed that the value was less than that amount. He guaranteed the loan because he planned to direct any cable-laying contracts he received from Storer to Midwestern. Pursuant to the Agreement, the Bank loaned $ 100,000 to Midwestern. Nevertheless, in 1982, Midwestern went out of business. Midwestern's assets were sold for $ 202,000 in an attempt *203 to pay its liability to the Bank. Petitioner filed bankruptcy in 1982. Storer was awarded the northwest suburbs cable franchise in the Minneapolis-St. Paul area. It awarded a contract for half the work of laying cable for this franchise to petitioner personally. Gateway Communications, Inc. (Gateway), a corporation in the business of laying underground cable, contacted petitioner and asked him to direct Storer's cable-laying contract to Gateway. In exchange, Gateway entered into an employment contract with petitioner on November 5, 1982. Among other things, the contract provided that Gateway would pay petitioner a commission of 1 percent on the first $ 18,000,000 and of 2 percent on the excess over $ 18,000,000 of the gross receipts derived from the sale of services resulting from petitioner's efforts. Although petitioner was paid approximately $ 350,000 under the contract, he did very little actual work for Gateway. On April 6, 1983, the Bank commenced proceedings to foreclose its interest on petitioners' personal residence. On January 13, 1986, petitioners paid $ 163,633.73 to the Bank to pay off the debt that was secured by their personal residence. On their Federal income *204 tax return for 1986, petitioners deducted a loss of $ 161,932 as a business bad debt. The reason for the discrepancy between the amount petitioners paid to the Bank and the amount they deducted on their Federal income tax return is not explained in the record. ULTIMATE FINDING OF FACT Petitioner's dominant motivation in guaranteeing the loan to Midwestern was to benefit as an investor in Midwestern. OPINION Petitioners contend that their payment in 1986 on their guarantee of the loan to Midwestern was a bad debt fully deductible under section 166(a)(1). Respondent contends that the payment was a nonbusiness bad debt deductible only within the limitations imposed by section 166(d)(1). Petitioners bear the burden of proof. Rule 142(a). Section 166(a)(1) provides that "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." Section 166(d)(1) limits the deductibility of nonbusiness debts of a taxpayer other than a corporation by providing for their treatment as short-term capital losses. A nonbusiness debt is a debt other than "a debt created or acquired * * * in connection with a trade or business of the taxpayer". Sec. 166(d)(2)(A). *205 "The question whether a debt is a nonbusiness debt is a question of fact in each particular case." Sec. 1.166-5(b), Income Tax Regs. A debt must be proximately related to the conduct of a trade or business of the taxpayer in order to constitute a business debt. Id. Whether the taxpayer is engaged in a trade or business is a question of fact. Dorminey v. Commissioner, 26 T.C. 940, 945 (1956). Whether a debt bears a proximate relation to that trade or business is determined based on the dominant motivation of the taxpayer in incurring the debt. United States v. Generes, 405 U.S. 93, 104 (1972). Petitioners contend that, because petitioner, in his individual capacity and not as an employee of Midwestern, spent a substantial amount of time between 1979 and 1981 lobbying on behalf of Storer in order to obtain a cable-laying contract from it, and later directed the contract to his new employer, Gateway, petitioner was in the trade or business of laying underground cable. A shareholder of a corporation is not engaged in the trade or business in which the corporation is engaged unless the shareholder engages in such trade or business apart *206 from his affiliation with the corporation. See Dalton v. Bowers, 287 U.S. 404, 407-408 (1932). Petitioner was not independently engaged in the trade or business of laying underground cable. Rather, he was engaged in the trade or business of being an employee of a corporation engaged in the trade or business of laying underground cable. Petitioner guaranteed the loan to Midwestern because he planned to direct any cable-laying contracts he received from Storer to Midwestern. Petitioner testified that, had Midwestern been in existence when he received the cable-laying contract from Storer, he would have earned double or triple the amount of money he earned from directing the contract to Gateway. Petitioner's dominant motivation in guaranteeing the loan was to benefit as an investor in Midwestern. Petitioner did not act in order to protect his trade or business as an employee of Midwestern or any other corporate entity. The cases relied upon by petitioners are therefore distinguishable from this case. In those cases, the taxpayers were engaged in trades or businesses with respect to which they made loans, paid debts, or incurred expenses. See Lundgren v. Commissioner, 376 F.2d 623 (9th Cir. 1967), *207 revg. T.C. Memo. 1965-314 (taxpayer was in the business of selling timber); Milbank v. Commissioner, 51 T.C. 805 (1969) (taxpayer was in the trade or business of investment banking); Pepper v. Commissioner, 36 T.C. 886 (1961) (taxpayers were in the trade or business of the practice of law); Marks v. Commissioner, 27 T.C. 464 (1956) (taxpayer was in the trade or business of being an investment banker and director); Dorminey v. Commissioner, 26 T.C. 940 (1956) (taxpayer was in the produce business); Jenkins v. Commissioner, T.C. Memo 1983-667 (taxpayer was in the business of being a country music performer); Frazier v. Commissioner, T.C. Memo. 1975-220 (taxpayer was in the real estate business); Artstein v. Commissioner, T.C. Memo. 1970-220 (taxpayer was in the trade or business of being a shoe designer and salesman). The guarantee was not proximately related to petitioner's trade or business of being an employee of Midwestern. Therefore, petitioners may not deduct their payment on the guarantee as a business bad debt. They may *208 deduct the payment as a nonbusiness bad debt. Petitioners argue, in the alternative, that they are entitled to a deduction under section 162 as an ordinary and necessary business expense. Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Petitioner's only trade or business during 1981 was that of being an employee of Midwestern. Petitioner did not incur the guarantee in carrying on that trade or business but, rather, in his capacity as an investor in Midwestern. The payment is not deductible under section 162. Petitioners next contend that they should be permitted to deduct a portion of their payment on the guarantee as interest. This argument was raised at the conclusion of the trial. Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." "Interest accruing during the time a taxpayer is secondarily liable for a debt is not deductible as such when paid, but is treated as a payment of principal. Only interest accruing when the taxpayer is primarily liable *209 on a debt is treated as 'interest on indebtedness' for the purpose of section 163(a)." Arrigoni v. Commissioner, 73 T.C. 792, 806 (1980). Petitioner testified that the difference between the $ 100,000.00 principal amount of the guarantee and the $ 163,633.73 paid to the Bank was interest. Respondent argues that the amount paid necessarily included unspecified costs that petitioners were required to pay pursuant to the Agreement. Furthermore, petitioners have offered no evidence as to what portion, if any, of the interest accrued after petitioners became primarily liable on the guarantee. Petitioners have therefore failed to meet their burden of proof. They may not deduct as interest any portion of their payment on the guarantee. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155.